# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

Nº 04-CV-1101 (JFB) (WDW)

———————————

DAVID MCANANEY, CAROLYN MCANANEY,
JOHN REILLY, CONSTANCE REILLY, PHILIP RUSSO,
CYNTHIA RUSSO, and GEOFFREY HORN,
individually and on behalf of all others similarly situated,

Plaintiffs,

VERSUS

ASTORIA FINANCIAL CORP., ASTORIA FEDERAL SAVINGS
& LOAN ASSOC., ASTORIA FEDERAL MORTGAGE CORP.,
LONG ISLAND BANCORP, INC., and LONG ISLAND
SAVINGS BANK, FSB,

Defendants.

———————————

**MEMORANDUM AND ORDER**
September 29, 2009

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiffs brought this class action against defendants Astoria Financial Corporation (hereinafter, "Astoria Financial), Astoria Federal Savings and Loan Association (hereinafter, "Astoria Federal"), Astoria Federal Mortgage Corporation (hereinafter, "Astoria Mortgage"), Long Island Bancorp, Inc. (hereinafter "LIB"), and Long Island Savings Bank, FSB (hereinafter, "LISB") (collectively, "defendants"), alleging violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*, state consumer protection statutes, New York Real Property Law § 274-a, New York Real Property Actions & Proceedings Law § 1921, and common law claims for breach of contract, fraud and unjust enrichment. Previously, this Court certified the following class of plaintiffs under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure:

All consumers or borrowers in the United States who had or currently have a mortgage or residential loan originated or purchased by any of the defendants and who wrongfully paid or will be demanded to pay closing fees, satisfaction fees, discharge fees, prepayment fees (or penalties), refinance fees (or penalties), attorney document preparation fees, facsimile fees, recording fees and any other fees, charges, false debts or finance charges in contravention of their mortgage or loan contracts or applicable laws.

Currently before the Court are the parties' renewed cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and plaintiffs' motion for costs and fees. For the reasons set forth below, defendants' motion for summary judgment is granted with respect to defendants Astoria Financial and LIB, and, accordingly, those two parties are terminated as defendants from this case. In addition, defendants' motion for summary judgment as to the remaining defendants is partially granted with respect to the claim brought by named plaintiff Geoffrey Horn under the Home Ownership and Equity Protection Act of 1994 ("HOEPA"), 15 U.S.C. § 1369, and generally with respect to class plaintiffs' claims under New York Real Property Law § 274-a, New York Real Property Actions & Proceedings Law § 1921, and the common law claims for unjust enrichment and fraud. However, the Court denies defendants' motion for summary judgment as to plaintiffs' claims brought under TILA, breach of contract, and New York General Business Law § 349.

Plaintiffs' motion for summary judgment is denied in its entirety. Finally, the Court defers plaintiffs' motion for costs, without prejudice for renewal following trial.

I. BACKGROUND AND PROCEDURAL HISTORY

A. Background

The underlying facts giving rise to this litigation are comprehensively described by the Honorable Arthur D. Spatt, United States District Judge, in a prior decision addressing defendants' motion to dismiss (hereinafter, "*McAnaney I*"), and by the undersigned in prior decisions granting plaintiffs' motion for class certification (hereinafter, "*McAnaney II*") and an earlier motion for summary judgment (hereinafter, "*McAnaney III*"). *See McAnaney v. Astoria Fin. Corp.*, 357 F. Supp. 2d 578 (E.D.N.Y. 2005) ("*McAnaney I*"); *McAnaney v. Astoria Fin. Corp.*, No. 04-CV-1101 (JFB), 2006 WL 2689621 (E.D.N.Y. Sept. 19, 2006) ("*McAnaney II*"); *McAnaney v. Astoria Fin. Corp.*, No. 04-CV-1101 (JFB), 2007 WL 2702348 (E.D.N.Y. Sept. 12, 2007) ("*McAnaney III*"). As such, the Court presumes familiarity with the facts of this case, and only briefly recites within this section basic background facts adduced during discovery regarding the loan agreements of the named plaintiffs and the basic dispute. Additional facts that are relevant to the instant motions are set forth in further detail in the Discussion section *infra*, taken from the parties' depositions, affidavits, exhibits, and from the parties' respective Local Rule 56.1 statements of facts. Upon consideration of each motion for summary judgment, the Court shall construe the facts in the light most favorable

to the non-moving party. *See Capobianco v. N.Y.*, 422 F.3d 47, 50 n.1 (2d Cir. 2001).

### 1. The McAnaneys

On February 4, 1993, David and Carolyn McAnaney ("the McAnaneys") obtained a residential loan relating to their residence located in Belle Terre, New York, in the form of a mortgage from LISB (hereinafter, "the McAnaneys' First Loan").[1] (Pls.' 56.1 ¶ 1.)[2] The McAnaneys' First Loan was serviced by defendant LISB until that entity was acquired by defendant Astoria Federal and/or defendant Astoria Financial (*Id*. ¶ 3; Defs.' Am. Resp. 56.1 ¶ 3.)[3] Thereafter, Astoria Federal serviced the McAnaneys' First Loan until it was sold to the Federal National Mortgage Association ("Fannie Mae"). (Pls.' 56.1 ¶ 5.)

On November 18, 2002, Astoria Federal sent the McAnaneys a "payoff letter" via facsimile, which listed several fees to be paid by the McAnaneys which were "necessary to satisfy" the McAnaneys' First Loan. (*Id*. ¶ 6.) The amount listed on the payoff letter included: (1) an "Atty Doc Prep Fee" of $125; (2) a "Facsimile Fee" of $25; and (3) a "Recording Fee" of $64.50.[4] (*Id*. ¶¶ 7, 14, 16; Pls.' Resp. 56.1 ¶¶ 67-69.)

It is undisputed that the McAnaneys should not have been charged the Atty Doc Prep Fee by Astoria Federal with regard to the McAnaneys' First Loan. (Pls.' 56.1 ¶ 11; Defs.' Am. Resp. 56.1 ¶ 11.) According to defendants, Astoria Federal improperly demanded the Atty Doc Prep Fee from the McAnaneys due to a "programming error" in an automated computer system used by Astoria Federal. (Pls.' 56.1 ¶ 9.)

Regardless of the reason for the error, plaintiffs assert that the McAnaneys paid the Atty Doc Prep Fee to Astoria Federal, and that Astoria Federal retained the fee. (Defs.' Am. Resp. 56.1 ¶ 8.) However, defendants assert that, upon discovery of its error, Astoria refunded the fee to an escrow account held by the McAnaneys. (*Id*. ¶ 12; Defs.' 56.1 ¶ 61; Pls.' Resp. 56.1 ¶ 61.) In any event, it is undisputed that Astoria Federal did not inform the McAnaneys that it had improperly demanded or collected the Atty Doc Prep Fee, or that it had refunded such a fee to the McAnaneys' escrow account. (Pls.' 56.1 ¶ 13; Defs.' Am. Resp.

---

[1] In *McAnaney III*, this Court dismissed the TILA claims of the McAnaneys as untimely under the relevant statute of limitations. *See McAnaney III*, 2007 WL 2702348, at *12 ("[D]efendants' motion for summary judgment as to plaintiffs' TILA claims that accrued on or before March 15, 2003, is granted on statute of limitations grounds. Therefore, the TILA claims of any class member who obtained a loan from defendants on or before March 15, 2003, more than one year prior to the filing of this action, are dismissed."). However, the McAnaneys continue to be named plaintiffs in this case with respect to all of the state law causes of action.

[2] Where only one party's 56.1 statement is cited, the other party does not dispute the facts alleged, or there is no evidence controverting such fact, unless otherwise noted.

[3] In *McAnaney III*, the Court granted leave for defendants to amend their Local Rule 56.1 statement and their responses to plaintiffs' Local Rule 56.1 statement. *See McAnaney III*, 2007 WL 2702348, at *1 n.1.

[4] The Court will hereinafter refer to these three types of fees collectively as the "Disputed Fees."

56.1 ¶ 13; Pls.' Resp. 56.1 ¶ 76.) It is further undisputed that the McAnaneys paid the Facsimile Fee and the Recording Fee to Astoria Federal. (Pls.' 56.1 ¶¶ 15, 17.)

The McAnaneys obtained a second residential loan from LISB concerning a property located in Port Jefferson, New York (hereinafter, "the McAnaneys' Second Loan"). (Pls.' 56.1 ¶ 25.) On November 18, 2002, Astoria Federal sent the McAnaneys a "payoff letter" relating to the McAnaneys' Second Loan, which listed several fees to be paid by the McAnaneys which were "necessary to satisfy" the loan. (*Id.* ¶ 29.) The amount listed on the payoff letter included: (1) an "Atty Doc Prep Fee" of $125; (2) a "Facsimile Fee" of $25; and (3) a "Recording Fee" of $64.50. (*Id.* ¶¶ 30, 36, 38.) It is undisputed that the McAnaneys paid each of these fees to Astoria Federal. (*Id.* ¶¶ 31, 37, 39.)

## 2. The Reillys

On or about March 28, 2002, John and Constance Reilly ("the Reillys") obtained a residential loan in the form of a mortgage from Astoria Federal (hereinafter, "the Reilly Loan").[5] (Pls.' 56.1 ¶ 47.) The Reilly Loan was serviced by Astoria Federal until the time it was repaid. (*Id.* ¶ 49.) On April 16, 2004, and April 19, 2004, respectively, Astoria Federal sent the Reillys two "payoff letters" which listed several fees

to be paid by the Reillys that were "necessary to satisfy" the loan, including: (1) an "Atty Doc Prep Fee" of $125; (2) "Facsimile Fees" of $25 and $50; and (3) a "Recording Fee" of $44.50. (*Id.* ¶¶ 51, 53, 59, 62; Defs.' 56.1 ¶¶ 97-98.)

It is undisputed that the Reillys paid the Facsimile Fee to Astoria Federal, and that Astoria Federal deducted the Recording Fee from funds held in escrow by Astoria Federal for the Reillys. (Pls.' 56.1 ¶¶ 56, 61, 64; Defs.' Am. Resp. 56.1 ¶¶ 56, 61, 64; Defs.' 56.1 ¶¶ 46-47, 103; Pls.' Resp. 56.1 ¶¶ 46-47, 103.) Plaintiffs claim that they paid the Atty Doc Prep Fee to Astoria Federal, but defendants dispute that and claim that the fee was never collected. (Pls.' 56.1 ¶ 55; Defs.' Am. Resp. 56.1 ¶ 55; Defs.' 56.1 ¶ 103; Pls.' Resp. 56.1 ¶ 103.) Defendants further dispute plaintiffs' contention that any collection of the Disputed Fees was in breach of the loan agreement. (Defs.' Resp. 56.1 ¶¶ 54-57.)

## 3. The Russos

On or about November 12, 1993, Philip and Cynthia Russo ("the Russos") obtained a residential loan from LISB in the form of a mortgage (hereinafter, "the Russo Loan").[6] (Pls.' 56.1 ¶ 72.) The Russo loan was serviced by LISB until the bank was acquired by Astoria Federal; thereafter, the

---

[5] In *McAnaney III*, this Court also dismissed the TILA claims of the Reillys as untimely under the relevant statute of limitations. *See McAnaney III*, 2007 WL 2702348, at *12. However, as with the McAnaneys, the Reillys continue to be named plaintiffs in this case with respect to all of the state law causes of action.

[6] In *McAnaney III*, this Court also dismissed the TILA claims of the Russos as untimely under the relevant statute of limitations. *See McAnaney III*, 2007 WL 2702348, at *12. However, as with the McAnaneys and the Reillys, the Russos continue to be named plaintiffs in this case with respect to all of the state law causes of action.

loan was serviced by Astoria Federal until it was repaid. (*Id.* ¶¶ 74-75.) On June 2, 2004, Astoria Federal sent to the Russos a "payoff letter" which listed several fees to be paid by the Russos that were "necessary to satisfy" the Russo Loan, including: (1) an "Atty Doc Prep Fee" of $125; (2) a "Facsimile Fee" of $25; and (3) a "Recording Fee" of $64.50. (*Id.* ¶¶ 77-78, 85, 87; Defs.' 56.1 ¶¶ 83, 85; Pls.' Resp. 56.1 ¶¶ 83, 85.) It is undisputed that the Russos paid the Disputed Fees to Astoria Federal. (Pls.' 56.1 ¶¶ 79, 86, 88.)

It is also undisputed that the Russos should not have been charged the Atty Doc Prep Fee by Astoria Federal. (*Id.* ¶ 80; Defs.' Am. Resp. 56.1 ¶ 80.) According to defendants, Astoria Federal improperly demanded the Atty Doc Prep Fee from the Russos due to a "programming error" in an automated computer system used by Astoria Federal. (*Id.* 56.1 ¶ 81.) In any event, plaintiffs assert that the Russos paid the Atty Doc Prep Fee to Astoria Federal, and that Astoria Federal retained that fee. (Pls.' 56.1 ¶ 81; Defs.' Am. Resp. 56.1 ¶ 81.) However, defendants assert that, upon discovery of its error, Astoria Federal refunded the fee to an escrow account held by the Russos. (Defs.' Am. Resp. 56.1 ¶ 81; Defs.' 56.1 ¶ 61; Pls.' Resp. 56.1 ¶ 61.) Defendants also claim that they refunded the Recording Fee to the Russos. (Defs.' Am. Resp. 56.1 ¶ 88.) Astoria Federal did not inform the Russos that it had improperly demanded or collected the Atty Doc Prep Fee, or that it had refunded such a fee to the Russos' escrow account. (Pls.' 56.1 ¶¶ 83-84; Defs.' Am. Resp. 56.1 ¶¶ 83-84.)

On May 8, 2002, the Russos also obtained a residential loan from Astoria Federal in the form of a Home Equity Line of Credit (hereinafter, "the Russos' HELOC").[7] (Pls.' 56.1 ¶ 95.) The Russos' HELOC was serviced by Astoria Federal until it was repaid. (*Id.* ¶ 97.) In two "payoff letters" dated, respectively, June 2, 2004, and June 16, 2004, Astoria Federal listed the amounts "necessary to satisfy" the Russos' HELOC loan, including: (1) a "Satisfaction Fee/Atty Document Preparation Fee" of $125; and (2) a "County Clerk Fee/Recording Fee" of $64.50. (*Id.* ¶¶ 98-101, 107.) It is undisputed that the Russos paid both fees to Astoria Federal. (Pls.' 56.1 ¶¶ 106, 111; Defs.' Am. Resp. 56.1 ¶¶ 106, 111.)

Plaintiffs assert that Astoria Federal improperly demanded and collected the fees from the Russos. (Pls.' 56.1 ¶ 103; Defs.' Am. Resp. 56.1 ¶ 103; Defs.' 56.1 ¶ 92; Pls.' Resp. 56.1 ¶ 92.) Defendants dispute plaintiffs' contention that collection of any of the Disputed Fees was in breach of the loan agreement. (Defs.' Resp. 56.1 ¶¶ 105-06.)

---

[7] The Court notes that the Russos' TILA claims with respect to the HELOC loan are also time barred, as stated in this Court's Memorandum & Order dated January 25, 2008, which addressed plaintiffs' motion for reconsideration of the decision in *McAnaney III*. *See McAnaney v. Astoria Fin. Corp.*, No. 04-CV-1101, 2008 WL 222524, at *9 (E.D.N.Y. Jan. 25, 2008) (granting plaintiffs' motion for partial reconsideration with respect to the Russos' TILA claims regarding the HELOC loan, but that upon reconsideration, TILA claims remained time-barred under the relevant statute of limitations).

### 4. Geoffrey Horn

On August 13, 2003, Geoffrey Horn and Elizabeth Tomlinson Horn ("the Horns") obtained a purchase money mortgage loan on their residence in Bedford, New York. (hereinafter, "the Horn Loan"). [8] (Defs.' Supp. 56.1 ¶ 1.) Prior to closing, defendants provided a Federal Truth-In-Lending Disclosure (hereinafter, "TIL Disclosure"), which listed a $125 "Satisfaction Fee" amongst "prepaid" finance charges. (Defs.' Supp. 56.1 ¶¶ 5-6; Decl. of Alfred W.J. Marks, Apr. 17, 2008, Ex. F.) On January 24, 2005, Horn received a faxed payoff statement on the Horn Loan which listed several fees to be paid by the Horns, which were "necessary to satisfy" the loan. (Defs.' Supp. 56.1 ¶ 10; Decl. of Alfred W.J. Marks, Apr. 17, 2008, Ex. I.) The amount listed on the payoff letter included: (1) an "Atty Doc Prep Fee" of $125; (2) a "Facsimile Fee" of $25; and (3) a "Recording Fee" of $36.50. (Defs.' Supp. 56.1 ¶ 10; Decl. of Alfred W.J. Marks, Apr. 17, 2008, Ex. I.) It is undisputed that the Horns paid each of these fees to Astoria Federal. (Defs.' Supp. 56.1 ¶ 11.)

### B. Procedural History

Plaintiffs commenced this class action on March 16, 2004. The case was originally assigned to the Honorable Arthur D. Spatt,

United States District Judge. On July 16, 2004, plaintiffs filed an amended complaint. Thereafter, defendants moved to dismiss the amended complaint. The motion was granted in part and denied in part by Memorandum & Order dated February 17, 2005, and the parties were directed to proceed with discovery. *See McAnaney v. Astoria Fin. Corp.*, 357 F. Supp. 2d 578 (E.D.N.Y. 2005) (*McAnaney I*). On November 8, 2005, plaintiffs, with leave of the Court, filed a second amended class action complaint, adding certain state law claims. On March 31, 2006, the case was reassigned to the undersigned.

Thereafter, plaintiffs moved to certify a class. The motion was granted on September 19, 2006. *See McAnaney v. Astoria Fin. Corp.*, No. 04-CV-1101 (JFB), 2006 WL 2689621 (E.D.N.Y. Sept. 19, 2006) (*McAnaney II*). On October 20, 2006, plaintiffs moved for Court approval of the class notice and class notice plan.[9] On December 15, 2006, defendants moved for summary judgment. On December 21, 2006, plaintiffs cross-moved for partial summary judgment. Oral argument was heard on the parties' cross-motions on March 28, 2007. Thereafter, the parties submitted additional briefing regarding defendants' motion to amend their filings under Local Civil Rule 56.1 and their responses to plaintiffs' requests to admit, as well as plaintiffs' motion for costs and fees. By Memorandum and Order dated September 12, 2007, the Court granted defendants' motion in part, dismissing all the named plaintiffs' TILA claims as being

---

[8] By Order dated September 29, 2009, the Court granted the plaintiffs' motion to intervene Geoffrey Horn as a new named plaintiff. Because the Horn Loan originated after March 15, 2003, Horn's TILA claim is not time-barred under the relevant statute of limitations, as set forth in *McAnaney III*. *See* 2007 WL 2702348, at *12.

[9] Plaintiffs later consented to hold the class notice and class notice plan motion in abeyance pending the resolution of the parties' cross-motions for summary judgment.

time-barred under the relevant statute of limitations. *See McAnaney v. Astoria Fin. Corp.*, No. 04-CV-1101 (JFB), 2007 WL 2702348 (E.D.N.Y. Sept. 12, 2007) (*McAnaney III*); *see also McAnaney v. Astoria Fin. Corp.*, No. 04-CV-1101 (JFB), 2008 WL 222524 (E.D.N.Y. Jan. 25, 2008) (granting plaintiffs' motion for partial reconsideration regarding the Russo HELOC loan, holding that TILA claim on Russo HELOC Loan was time-barred). After the Court found that none of the named plaintiffs had viable TILA claims, it decided to afford plaintiffs' counsel a reasonable period of time for substitution or intervention of a new class representative. *See McAnaney III*, 2007 WL 2702348, at *13. Based on the ruling regarding the statute of limitations, the Court declined to address the remaining issues until the defect in class representation was addressed, and accordingly dismissed the remaining branches of the parties' cross motions without prejudice to the parties refiling the motions following resolution of the class representatives issue. *See id.* at *14. On February 29, 2008, plaintiffs filed a motion to intervene Geoffrey Horn as a new named plaintiff. Following oral argument regarding the intervention motion on September 29, 2008, the Court granted plaintiffs' motion on the record. As directed by the Court, plaintiffs subsequently filed a third amended complaint on October 13, 2008.

On December 3, 2008, plaintiffs renewed their motion for summary judgment, and defendants thereafter renewed their cross-motion for summary judgment on December 5, 2008. Plaintiffs filed opposition papers to defendants' motion on December 20, 2008, and defendants filed a supplemental reply

memorandum in further support of their motion for summary judgment and in opposition to plaintiffs' motion for summary judgment on December 22, 2008. On March 17, 2009 and June 30, 2009, plaintiffs filed supplemental letters providing further argument, to which defendants replied on March 19, 2009 and July 2, 2009. This matter is fully submitted. All submissions, including materials submitted in connection with the initial motions for summary judgment incorporated by reference, have been considered by the Court.[10]

---

[10] During the conference held on September 29, 2008, the Court consented to allowing the parties to rely on prior submissions incorporated by reference. For citation purposes, the Court uses the following abbreviations in this Memorandum & Order to refer to the various memorandums of law submitted in the instant case: (1) Defendants' Memorandum in Support of their Motion for Summary Judgment, dated December 15, 2006, is hereinafter referred to as "Defs.' Mem."; (2) Plaintiffs' and Certified Classes' Memorandum of Law in Support of Motion for Partial Summary Judgment, dated December 20, 2006, is hereinafter referred to as "Pls.' Mem."; (3) Plaintiffs' and Certified Class' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, dated March 2, 2007, is hereinafter referred to as "Pls.' Opp. Mem."; (4) Defendants' Memorandum and Opposition to Plaintiffs' and Class Members' Motion for Partial Summary Judgment, dated March 5, 2007, is hereinafter referred to as "Defs.' Opp. Mem."; (5) Defendants' Reply Memorandum in Support of their Motion for Summary Judgment, dated March 16, 2007, is hereinafter referred to as "Defs.' Reply Mem."; (6) Plaintiffs' and Certified Classes' Supplemental Memorandum of Law in Further Support of their Motion for Partial Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment, dated December 3, 2008, is hereinafter referred

## II. Standard of Review

### A. Summary Judgment Standard

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co*., 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party,

and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986)) (emphasis in original). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id*. at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co*., 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co*., 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

---

to as "Pls.' Supp. Mem."; (7) Defendants' Supplemental Memorandum in Support of Renewed Motion for Summary Judgment and in Opposition to Plaintiffs' and the Class' Motion for Summary Judgment, dated December 5, 2008, is hereinafter referred to as "Defs.' Supp. Mem."; (8) Plaintiffs' and Certified Classes' Response to Defendants' Supplemental Summary Judgment Memorandum of Law, dated December 20, 2008, is hereinafter referred to as "Pls.' Supp. Opp. Mem."; and (9) Defendants' Supplemental Reply Memorandum in Support of Renewed Motion for Summary Judgment and in Opposition to Plaintiffs' and the Class' Motion for Summary Judgment, dated December 22, 2008, is hereinafter referred to as "Defs.' Supp. Reply Mem."

## B. Law of the Case Doctrine

Plaintiffs repeatedly argue that a number of the arguments raised by defendants are foreclosed pursuant to the "law of the case" doctrine, based upon decisions made by Judge Spatt in denying defendants' motion to dismiss in the instant case, as well as other decisions by the undersigned. Plaintiffs' specific assertions regarding decisions that they claim are entitled to deference as law of the case are discussed in more detail *infra*, but the Court notes that plaintiffs are occasionally incorrect in relying on this doctrine, as certain issues were not in fact decided by Judge Spatt or this Court. Moreover, to the extent that plaintiffs are correct that some of defendants arguments were in fact raised to or addressed by Judge Spatt or the undersigned, the Court notes that "[a]pplication of the 'law of the case' doctrine is 'discretionary and does not limit a courts power to reconsider its own decisions prior to final judgment.'" *RSL Comm'cns, PLC v. Bildirici*, No. 04-CV-5217 (RJS), 2009 WL 454136, at *2 (S.D.N.Y. Feb. 23, 2009) (quoting *Sagendorf-Teal v. County of Rensselaer*, 100 F.3d 270, 277 (2d Cir. 1996)); *see also Arizona v. California*, 460 U.S. 605, 618 (1983) ("Law of the case directs a court's discretion, it does not limit the tribunal's power."); *accord DiLaura v. Power Auth. of the State of N.Y.*, 982 F.2d 73, 76 (2d Cir. 1992); *Golden Pac. Bancorp v. F.D.I.C.*, No. 95-CV-9281 (NRB), 2003 WL 21496842, at *5 n.14 (S.D.N.Y. June 27, 2003) ("[W]hen the mandate of a higher court is not involved, the law of the case doctrine is a discretionary one.").

Of course, the discretionary law of the case doctrine applies to issues of law already decided by the Court. However, because of the divergent standard of review applicable to motions to dismiss and motions for summary judgment, the law of the case doctrine is inapposite to the Court's analysis of whether, after the close of discovery, genuine issues of fact have been raised which survive summary judgment. *See Nobel Ins. Co. v. City of N.Y.*, No. 00-CV-1328 (KMK), 2006 WL 2848121, at *4 (S.D.N.Y. Sept. 29, 2006) ("[A]s a ruling in favor of a plaintiff on a motion to dismiss does not address the merits of a case, such ruling will not preclude a subsequent ruling in favor of a defendant on the same issue on a motion for summary judgment following discovery. . . [t]he law of the case doctrine . . . does not preclude this Court from reconsidering issues on summary judgment that have initially been raised in the context of a motion to dismiss."); *see also McKenzie v. BellSouth Telecommc'ns., Inc.*, 219 F.3d 508, 513 (6th Cir. 2000) ("[O]ur holding on a motion to dismiss does not establish the law of the case for purposes of summary judgment, when the complaint has been supplemented by discovery.").

In accordance with the foregoing, in each instance that prior decisions of Judge Spatt or the undersigned are invoked, the Court has carefully scrutinized the decision, and the evidence developed during discovery, to determine whether adherence to the law of the case doctrine is warranted.

## III. DISCUSSION

### A. Improper Defendants

Defendants claim that discovery has demonstrated that certain parties are not proper defendants to this action. Specifically, defendants argue that Astoria Financial and LIB are bank holding companies that did not originate or service the loans at issue, and are therefore not subject to potential liability for the claims alleged in this case.[11] (*See* Defs.' Mem. at 40; Defs.' Supp. Mem. at 25.) Plaintiffs do not dispute the fact that Astoria Financial and LIB (collectively, "bank holding company defendants") were not involved in originating or servicing the loans, but rather assert that the bank holding company defendants may be held liable because they exercised control over their subsidiaries. (*See* Pls.' Opp. Mem. at 59-61.) As set forth below, the Court agrees with defendants that the bank holding company defendants should be dismissed from the instant case because there is no evidence indicating their direct involvement, and there is insufficient record evidence from which a finder of fact could reasonably conclude that the corporate veil should be pierced under an alter ego theory of liability.

---

[11] Plaintiffs assert that this argument was already considered and rejected by this Court. Although defendants asserted that they were improper defendants in their initial motion to dismiss this action, Judge Spatt did not address this issue in either the Memorandum & Order denying defendants' motion to dismiss, or in the Memorandum & Order denying defendants' motion for reconsideration.

As a baseline matter, parent companies are generally not liable for actions of their subsidiaries. *See De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 69 (2d Cir. 1996) ("As a general matter, . . . a corporate relationship alone is not sufficient to bind a parent corporation for the actions of its subsidiary.") (citation and internal quotation marks omitted). However, "[i]n some instances, the corporate relationship between a parent and its subsidiary [is] sufficiently close . . . to justify piercing the corporate veil and holding one corporation legally accountable for the actions of the other." *De Jesus*, 87 F.3d at 69 (citation and internal quotation marks omitted). Under New York law, two elements must be shown in order to pierce the corporate veil: "(i) that the owner exercised complete dominion over the corporation with respect to the transaction at issue; *and* (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Thrift Drug, Inc. v. Universal Prescription Adm'rs*, 131 F.3d 95, 97 (2d Cir. 1997) (citations and internal quotation marks omitted) (emphasis in original); *see also Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1998) (noting that to pierce the corporate veil the "parent must exercise complete dominion 'in respect to the transaction attacked' so that the subsidiary had 'at the time' no separate will of its own and such domination must have been used to 'commit the fraud or wrong' against plaintiff, which proximately caused plaintiff's injury.") (quoting *Lowendahl v. Baltimore & Ohio R.R.*, 247 A.D. 144, 157 (N.Y. App. Div. 1936)); *accord Marketplace LaGuardia Ltd. P'ship v. Harkey Enters., Inc.*, No. 07-CV-1003 (CBA), 2008 WL 905188, at *2 (E.D.N.Y. Mar. 31, 2008). In the Second Circuit, courts look at a number of non-exclusive

factors to determine whether the necessary dominion and control exists for the Court to pierce the corporate veil, including: "(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." *William Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991). In applying these factors, "there is a presumption of separateness . . . which is entitled to substantial weight." *Am. Protein Corp.*, 844 F.2d at 60.

In support of their position that liability may be potentially imposed on the bank holding company defendants, plaintiffs primarily point to undisputed facts that demonstrate that the bank holding company defendants owned controlling interests in the defendants whose direct involvement is alleged. Specifically, plaintiffs cite: (1) admissions that Astoria Financial is the parent company of Astoria Federal and that

LIB was the parent company of LISB; and (2) undisputed record evidence that Astoria Financial and LIB consolidated the financial results of their subsidiaries in their publicly-filed financial statements. (Decl. of Joseph S. Tusa, Dec. 20, 2005, Ex. 2; Decl. of Joseph S. Tusa, Mar. 2, 2007, Ex. Y). However, it is well-settled that these facts, which simply demonstrate that the bank holding company defendants had controlling interests in the subsidiary defendants,[12] are insufficient, standing alone, to pierce the corporate veil. *De Jesus*, 87 F.3d at 69 ("'[O]wnership by a parent of all its subsidiary's stock has been an insufficient reason in and of itself to disregard distinct corporate entities. Actual domination, rather than the opportunity to exercise control, must be shown.'") (quoting *Williams v. McAllister Bros. Inc.*, 534 F.2d 19, 21 (2d Cir. 1976)). Plaintiffs also point to record evidence that the bank holding company defendants and their subsidiaries shared common officers and directors (Decl. of Joseph S. Tusa, Dec. 20, 2006, Ex. 1; Decl. of Joseph S. Tusa, Mar. 2, 2007, Exs. Y, PP), but this *Resnick* factor, without more than otherwise indicated in the instant case,

---

[12] The fact that the bank holding company defendants consolidated the financial results of their subsidiaries in publicly filed statements merely reflects compliance with the SEC requirement that corporations consolidate the results of subsidiaries for which they own a 50 percent or more interest in such statements, and is not probative of control for corporate veil piercing purposes. *See Volkswagenwerk Akteingesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 121 n.3 (2d Cir. 1984) (noting that generally accepted accounting principles require parent corporations to consolidate financial statements if parent corporation owns more than 50 percent of subsidiary's stock).

is insufficient as a matter of law to establish alter ego liability of a parent corporation. *See Greene v. Long Island R.R. Co.*, 280 F.3d 224, 235 (2d Cir. 2002) ("[C]orporate ownership of a subsidiary and overlapping offices and directorates are not, without more, sufficient to impose liability on the parent for conduct of the subsidiary[.]"); *see also In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 538 (S.D.N.Y. 2008) (holding that ownership and overlapping directors are insufficient, standing alone to pierce the corporate veil); *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 342 F. Supp. 2d 207, 216 (S.D.N.Y. 2004) ("Courts have held, however, that factors such as sole ownership, overlapping directors, consolidated financial statements, and reference to the subsidiary as a department are insufficient to establish the type of day-to-day control necessary to disregard corporate separateness."); *Allied Programs Corp. v. Puritan Ins. Co.*, 592 F. Supp. 1274, 1277 (S.D.N.Y. 1984) ("'It is well settled that there must be complete domination and control before the parent's corporate veil can be pierced. Stock control, interlocking directors and officers, and the like, are in and of themselves insufficient.'") (quoting *Musman v. Modern Deb. Inc.*, 377 N.Y.S.2d 17, 20 (N.Y. App. Div. 1975)).[13]

The facts which plaintiffs claim indicate excessive control and domination in the instant case – controlling ownership interest in subsidiaries, reporting of consolidated results of such subsidiaries in public filings, and overlapping directors and officers between parent and subsidiary corporations – are commonplace as generally-accepted corporate form, and are insufficient without more, as a matter of law, to eviscerate the presumption of corporate separateness.

In sum, the Court finds that on the record evidence, no finder of fact could reasonably determine that the bank holding company defendants could be held liable for the claims alleged in this case under an alter ego theory of liability. Accordingly, Astoria Financial and LIB are entitled to judgment as a matter of law, and shall be terminated as defendants from this case. *See, e.g.*,

---

[13] The only other evidence that plaintiffs point to are two press releases, issued by Astoria Financial, which include discussions regarding the lending activities of its subsidiaries. (Decl. of Joseph S. Tusa, Mar. 2, 2007, Exs. E, CC.) The cited press releases in no manner whatsoever represent Astoria Financial as being directly involved in the lending activities, and all accurately represent the fact that the services are performed by its subsidiaries. These statements are no more probative of dominion or control than publicly consolidated financial statements, and are even less probative than statements affirmatively referring to a subsidiary as a "department" or "unit" of a parent, which has been found, in combination with the other factors present in this case, to be insufficient as a matter of law to justify piercing the corporate veil. *See, e.g.*, *In re Ski Train Fire*, 342 F. Supp. 2d at 216 (dismissing claims against parent corporation under alter ego theory of liability, where only evidence of control consisted of sole ownership of subsidiary, overlapping directors, consolidated financial statements and reference to the subsidiary as a unit); *see also Colcord v. Armstrong World Indus., Inc.*, No. 84-JM-912, 1985 WL 17481, at *3 (D. Colo. May 13, 1985) (finding corporate veil piercing not warranted as a matter of law, notwithstanding evidence that parent corporation owned 100 percent of subsidiary, had control over policy and large capital expenditures, used consolidated financial statements, and referred to subsidiaries as "units or divisions" in reports and brochures).

*Warburton v. Foxton's Inc.*, No. 04-CV-2474 (FLW), 2005 WL 1398512, at *8 (D.N.J. June 13, 2005) (granting defendant summary judgment on plaintiff's TILA claim where plaintiff sought to hold defendant liable for its subsidiary's actions and plaintiff's only showing was that defendant was the lender's parent company); *see also In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 425-27 (S.D.N.Y. 2003) (dismissing TILA claims as a matter of law as to bank holding parent companies where they did not extent credit and corporate veil piercing was not justified by the allegations).[14]

---

[14] Plaintiffs incorrectly cite *Moses v. Citicorp Mortgage, Inc.*, 982 F. Supp. 897 (E.D.N.Y. 1997) for the proposition that they may sustain claims against a bank holding company for acts of its subsidiary as a matter of law. *Moses* merely denied a motion to dismiss as to Citicorp, a bank holding company, where the complaint alleged "direct participation" of Citicorp. *See* 982 F. Supp. at 902 ("On the face of the complaint, however, plaintiffs accuse *both* Citicorp and [subsidiary Citicorp Mortgage, Inc.] of direct participation in activity that violates RESPA. There is therefore no need at this juncture to address the alter ego theory . . ."). The instant case, now at the summary judgment stage, is in a different procedural posture, and does not assume facts alleged in the complaint as true, but rather must look to the evidence on the record to see if factual support exists to support plaintiffs' allegations. As discussed *supra*, summary judgment is appropriate as to the bank holding company defendants, because following discovery, it is undisputed that they did not directly participate in the alleged wrongful acts, and plaintiff has failed to develop evidence which would justify corporate veil piercing as a matter of law.

## B. Truth In Lending Act

Plaintiffs and defendants each cross move for summary judgment on Horn's claim brought pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*, which alleges that the Disputed Fees constitute undisclosed finance charges or prepayment penalties.[15] As set forth in detail below, the Court has examined the record and has determined that disputed issues of material fact exist with respect to Horn's claims under TILA, and that summary judgment must therefore be denied.

### 1. Statutory Framework

In denying the motion to dismiss in the instant case, Judge Spatt provided the following well-detailed summary of the statutory framework applicable to the TILA claim alleged against defendants:

> [TILA] was enacted to assure meaningful disclosure of credit terms, avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices. 15 U.S.C. §§ 1601-65(b) (2004); *see also Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 559, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980) (stating that TILA's purpose is to assure "meaningful disclosure of credit terms to consumers"); *Stein v. JP Morgan Chase Bank*, 279 F. Supp. 2d 286, 291 (S.D.N.Y. 2003). Failure to make a required disclosure and satisfy the Act

---

[15] As stated *supra*, Horn is the only remaining named plaintiff alleging a claim under TILA.

may subject a lender to statutory and actual damages that are traceable to the lender's failure. *Beach v. Ocwen Federal Bank*, 523 U.S. 410, 412, 118 S.Ct. 1408, 1410, 140 L.Ed.2d 566 (1998).

In enacting TILA, Congress delegated authority to the Federal Reserve Board of Governors to promulgate implementing regulations and interpretations known as Regulation Z. 15 U.S.C. § 1604(a). These regulations, which are located at 12 C.F.R. Part 226 may be relied upon by creditors for protection from any civil or criminal liability. *See Household Credit Services, Inc. v. Pfennig*, 541 U.S. 232, 124 S.Ct. 1741, 1746, 158 L.Ed.2d 450 (2004). According to Regulation Z, the provisions of TILA apply to creditors that regularly offer or extend credit for personal, family, or household purposes, and that is payable by agreement in more than four installments, or subject to a finance charge. 12 C.F.R. § 226.1 (2004). As such, TILA is applicable to loans that are secured by real property or a dwelling such as residential mortgage transactions and home equity loans. *See id.* § 226.3(b). "Any person who originates 2 or more mortgages . . . in any 12-month period or any person who originates 1 or more such mortgages through a mortgage broker shall be considered to be a creditor for purposes of [TILA]." 15 U.S.C. § 1602.

In general, TILA requires creditors to disclose, among other things, all finance charges and prepayment provisions. 12 C.F.R. § 226.18. The "finance charge" is defined as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. §1605(a) (emphasis added). Regulation Z further explains that the finance charge is "the cost of consumer credit as a dollar amount." 12 C.F.R. § 226.4(a). Examples of finance charges in residential mortgage transactions include interest, points, loan fees, appraisal fees, credit report fees, mortgage insurance premiums, and debt cancellation fees. *Id*. § 226(b). Regulation Z expressly exempts from disclosure certain charges, such as credit application fees charged to all applicants, unanticipated charges for late payment or default, fees charged for participation in a credit plan, and the seller's points. *Id*. § 226(c).

In addition, the following fees related to residential mortgage transactions need not be disclosed if they are *bona fide* and reasonable: (1) fees for title examination, abstract of title, title insurance, property survey, and similar purposes; (2) fees for preparing loan-related documents, such as deeds, mortgages, and reconveyance or settlement documents; (3) notary and credit report fees; (4) property appraisal or inspection fees performed prior to closing; (5) amounts required to be paid into escrow or trustee accounts if the amounts would not otherwise be included in the finance charge. *Id*.

Regulation Z also allows a creditor to exclude taxes and fees "that actually are or will be paid to public officials for determining the existence of or for perfecting, releasing, or satisfying a security interest." *Id.* § 226.4(e)(1).

*McAnaney I*, 357 F. Supp. 2d at 583-84.

1. Section 1605(f) Accuracy Tolerance

As a threshold matter, a claim for undisclosed fees under TILA may only be sustained if the disputed fees are considered to be finance charges under the statute and applicable regulations. "In order to be considered a finance charge, a charge must be incident to, or a condition of, the extension of credit." *Pechinski v. Astoria Fed. Sav. and Loan Assoc.*, 345 F.3d 78, 80 (2d Cir. 2003) (citing 15 U.S.C. § 1605(a)) ("Except as otherwise provided in this section, the amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor *as an incident to the extension of credit.*") (emphasis added by *Pechinski*). As noted by Judge Spatt in deciding the motion to dismiss, the determination of whether charges are incident to the extension of credit and therefore included within the definition of the finance charge is "extremely fact-intensive" and "[t]he critical inquiry is whether the creditor only would have provided the loan with a guarantee that the mortgagor would pay the fee." *McAnaney I*, 357 F. Supp. 2d at 584 (citations and internal quotation marks omitted).

The focal point of defendants' argument that summary judgment is warranted on Horn's TILA claim regarding accurate disclosure of the finance charge centers upon the statute's "tolerances for accuracy" provision, codified at 15 U.S.C. § 1605(f). That provision establishes a safe harbor for small errors in disclosures regarding the finance charge, providing, *inter alia*, that required disclosures of the finance charges "shall be treated as accurate" under TILA "if the amount disclosed as the finance charge . . . does not vary from the actual finance charge by more than $100." 15 U.S.C. § 1605(f)(1)(A); *see also McCutcheon v. America's Servicing Co.*, 560 F.3d 143, 147 (3d Cir. 2009) (describing operation of TILA accuracy tolerance provision). Defendants specifically assert that assuming *arguendo* that the Facsimile Fee and Recording Fee assessed to Horn were fees that should have been properly disclosed as part of the finance charge, the issue critical to defendants' motion for summary judgment on Horn's TILA claim is whether there were disclosure deficiencies regarding the $125 Atty Doc Prep Fee, because the sum of the $25 Facsimile Fee and the $36.50 Recording Fee is less than the $100 accuracy tolerance threshold.[16] As an initial

---

[16] In fact, the Court notes that there are disputed material issues of fact regarding the Recording Fee and the Facsimile Fee components of Horn's TILA claim. It is undisputed that neither was disclosed in the finance charge for Horn or any other class members. However, with respect to the Recording Fee, such a fee may be properly excluded from the finance charge to the extent that that it comes under the exception for "[f]ees and charges prescribed by law which actually are or will be paid to public officials for determining the existence of or for perfecting or releasing or satisfying any security related to the

credit transaction." 15 U.S.C. § 1605(d)(1). Plaintiffs have offered evidence that, although $36.50 was collected from Horn for the recording, the Westchester County filing fee was only $34. (*See* Pls.' Intervention Ex. 2). If true, the overpayment of $2.50 should have been included in the finance charge. *See, e.g., Frazier v. Accredited Home Lenders, Inc.*, 607 F. Supp. 2d 1254, 1262 (M.D. Ala. 2009) (finding overpaid portion of title-insurance fee not bona fide and therefore should have been included in the finance charge); *see also Payton v. New Century Mortg. Corp.*, No. 03 C 333, 2003 WL 22349118, at *4 (N.D. Ill. Oct. 14, 2003) (holding that only the actual recording fee paid to a public official was properly excluded from the finance charge). With respect to the Facsimile Fee, as discussed in more detail *infra* in this Memorandum & Order's discussion regarding plaintiffs' breach of contract claim, there is a material issue of disputed fact regarding whether the fee was voluntarily incurred, specifically whether Horn and other class members were advised of the fee in advance of receiving the faxed payoff statements and whether they could have opted out. As correctly noted by Judge Spatt in denying defendants' motion to dismiss, the question regarding whether or not the Facsimile Fee should have been included in the finance charge depends on whether it was voluntarily assumed by the borrower. *See McAnaney I*, 357 F. Supp. 2d at 585. Indeed, if the jury was to make the factual finding that the Facsimile Fee was required by defendants in order to receive the payoff letter and Horn did not have an opportunity to opt out, then the Facsimile Fee was improperly excluded from the disclosed finance charge. *Compare Veale v. Citibank, F.S.B.*, 85 F.3d 577, 579 (11th Cir. 1996) (noting that although a Federal Express fee can be considered part of the finance charge when required by the lender, it may be excluded from the finance charge under TILA where a borrower can opt out from use of the courier and obtain the documents by another means which

matter, plaintiffs dispute that § 1605(f) would apply in such a manner, specifically arguing that: (1) the accuracy tolerance threshold does not create a bar to a TILA claim regarding disclosure of the finance charge; (2) even if applicable, the provision only applies to accidental and not intentional omissions regarding the finance charge; and (3) the provision does not apply to omissions of entire components of the finance charge. For the reasons set forth below, the Court rejects plaintiffs' arguments and agrees that the frame of analysis described by defendants is appropriate.

First, plaintiffs' contention that TILA claims for misstatements of the finance charge may survive summary judgment regardless of whether the $100 accuracy tolerance threshold is surpassed is contrary to the plain language of the statute. Section 1605(f) explicitly provides that errors in the finance charge that do not exceed $100 shall be "treated as accurate." Plaintiffs have not and cannot point to any provision of TILA which provides for liability for *accurate* disclosures. *See Sterten v. Option One Mortgage Corp.*, 479 F. Supp. 2d 479, 483

does not require a fee) *and Scott v. IndyMac Bank, FSB*, No. 03 C 6489, 2005 WL 730961, at *2 (N.D. Ill. Mar. 28, 2005) (courier fee not part of finance charge where not required or retained by creditor) *with Rodash v. AIB Mortgage Co.*, 16 F.3d 1142, 1147-48 (11th Cir. 1994) (holding that Federal Express fee required by lender was a transaction imposed by the lender as incident to the extension of credit and needed to be disclosed within the finance charge) *and Bank of N.Y. v. Mann*, No. 02 C 9265, 2004 WL 1878293, at *5 (N.D. Ill. Aug. 18, 2004) (holding that required courier fees must be included in the finance charge).

(E.D. Pa. 2007), *aff'd*, 546 F.3d 278 (3d Cir. 2008) (noting that there is "no statutory violation" of TILA where the finance charge is deemed accurate pursuant to § 1605(f); defendants entitled to judgment as a matter of law where finance charge variance was $57).[17]

The Court also rejects plaintiffs' assertion that the accuracy tolerance threshold under § 1605(f) includes a requirement that any variance under $100 be a *non-intentional* omission in order to be treated as accurate. In sole support of their argument that the accuracy tolerance provision incorporates a motive requirement, plaintiffs solely rely on a piece of TILA's legislative history, a statement issued by former Senator Paul Sarbanes of Maryland, who stated that § 1605(f) "is intended to protect lenders from . . . small errors of judgment . . . It is obviously not intended to give lenders the right to pad fees up to the tolerance limit of $100." 141 Cong. Rec. S. 14567 (daily ed. Sept. 28, 1995) (statement of Sen. Sarbanes). However, the Third Circuit has recently rejected plaintiffs' specific argument that the statute should be read to incorporate a motive requirement, based upon Senator Sarbanes' comment:

> [T]here is nothing to suggest that applying the tolerances provision turns on the motives of the creditor. The sole support [plaintiff] provides for that proposition is one reference in case law to a statement by then-Senator Paul Sarbanes . . . . But there is nothing in the actual text of § 1605(f) to indicate that courts have authority to condition application of the provision on the reason for a particular disclosure error. On the contrary the provision clearly states that "the disclosure of the finance charge . . . *shall* be treated as accurate for the purposes of this subchapter if the amount disclosed as the finance charge falls within the specified tolerances.

*In re Sterten*, 546 F.3d 278, 286 (3d Cir. 2008) (internal citations, quotation marks and alterations omitted); *see also McCutcheon*, 560 F.3d at 148-49 ("If anything, Senator Sarbanes's statement shows that Congress was conscious that the

---

[17] Plaintiffs incorrectly cite *Inge v. Rock Financial Corporation*, 281 F.3d 613 (6th Cir. 2002) for the proposition that creditors can be held liable under TILA regardless of whether the $100 tolerance threshold is surpassed. In *Inge*, the Sixth Circuit held that a plaintiff is not required to allege in his or her complaint a variance exceeding the $100 threshold in order to state a claim and survive a motion to dismiss, finding that the § 1605(f) tolerance threshold functions as an affirmative defense rather than as an essential element of a TILA claim. *See* 218 F.3d at 621-22. Even if *Inge* is correct that the accuracy tolerance provision functions as an affirmative defense, a defendant is entitled to summary judgment where the undisputed record demonstrates entitlement to a statutory affirmative defense. *See, e.g., Krause v. Titleserv, Inc.*, 402 F.3d 119 (2d Cir. 2005) (affirming grant of summary judgment on claim arising under the Copyright Act, where defendant demonstrated entitlement to affirmative defense established by 17 U.S.C. § 117(a)(1)); *see also Stofsky v. Pawling Central School Dist.*, -- F. Supp. 2d --, No. 06-CV-10231 (KMK), 2009 WL 804085, at *23 (S.D.N.Y. Mar. 27, 2009) ("Defendants are entitled to summary judgment on Plaintiff's claim of constructive discharge because there is no genuine issue of material fact as to Defendants' affirmative defense. . .").

tolerances of § 1605(f) might allow for certain improper behavior, yet deliberately chose not to condition application of the tolerances provision on a lender's motive.") The Court agrees with the Third Circuit's analysis, and declines plaintiffs' invitation to read a motive requirement into TILA based upon legislative history, where such a requirement is wholly unsupported by the plain text. *See Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 236 (2d Cir.), *cert. denied*, 549 U.S. 1097 (2006) ("When a statute's language is clear, our only role is to enforce that language according to its terms. We do not resort to legislative history to cloud a statutory text that is clear even if there are contrary indications in the statute's legislative history.") (citations and quotation marks omitted); *see also Green v. City of N.Y.*, 465 F.3d 65, 78 (2d Cir. 2006) ("Statutory analysis begins with the text and its plain meaning, if it has one. Only if an attempt to discern the plain meaning fails because the statute is ambiguous, do we resort to canons of construction. If both the plain language and the canons of construction fail to resolve the ambiguity, we turn to the legislative history.") (citation and quotation marks omitted); *United States ex rel. Fullington v. Parkway Hosp., Inc.*, 351 B.R. 280, 286 n.4 (E.D.N.Y. 2006) ("The Supreme Court has emphasized the dangers in courts interpreting statutes by relying on remarks from floor debates or similar comments by lawmakers to discern legislative intent.") (citing *Garcia v. United States*, 469 U.S. 70, 76 n.3 (1984) ("[T]o select casual statements from floor debates, not always distinguished for candor or accuracy, as a basis for making up our minds about what law Congress intended to enact is to substitute ourselves for the

Congress in one of its important functions.")).

Finally, the Court also finds that the § 1605(f) accuracy tolerance provision applies, even if entire components of the finance charge are omitted, so long as the total variance is less than $100. Plaintiffs do not cite *any* authority in favor of their position, and their argument disregards the applicable definition of the "finance charge" under TILA, which is "*the sum* of all charges . . . imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a) (emphasis added); *see also* 12 C.F.R. § 226.4(a). Plaintiffs' argument also ignores the fact that other courts have granted summary judgment in cases where the sum of disputed undisclosed elements of the finance charge is less than the $100 accuracy tolerance threshold established by § 1605(f). *See, e.g.*, *Edwards v. Accredited Home Lenders, Inc.*, No. 07-CV-0160 (KD), 2009 WL 559597, at *1 (S.D. Ala. Mar. 4, 2009) (noting previous grant of summary judgment based upon finding that the amount disclosed as a finance charge in the named plaintiff's TILA disclosure was "accurate" under the § 1605(f) accuracy tolerance threshold, notwithstanding that overpaid title-insurance and recording fees were entirely omitted from finance charge); *see also Stump v. WMC Mortgage Corp.*, No. Civ. A. 02-326, 2005 WL 645238, at *8 (E.D. Pa. Mar. 16, 2005) (granting summary judgment, finding that there were no genuine issues of material fact with respect to a non-disclosed $25 notary fee and a $15 courier fee, because the sum of the contested charges was under the § 1605(f) accuracy tolerance threshold). Accordingly, the Court finds that the defendants' proposed legal framework is

correct, and proceeds to focus upon issues regarding the disclosure of the $125 Atty Doc Prep Fee as part of the finance charge.

## 2. Atty Doc Prep Fee

Defendants present alternative arguments as to why there is no error in the finance charge disclosed with respect to the Atty Doc Prep Fee: (1) that the Atty Doc Prep Fee was in fact disclosed to Horn as part of the finance charge; or *alternatively*, that (2) the Atty Doc Prep Fee did not need to be disclosed to Horn as part of the finance charge, because either (a) it was not incident to the extension of credit; or (b) it falls under an exception for excludable document preparation fees.[18] For the reasons stated

below, the Court finds that upon examination of the record, there exist disputed issues of material fact with respect to each of the alternative theories, which preclude granting summary judgment in favor of defendants on the basis of either.

First, the Court finds that there is a material issue of disputed fact regarding whether the Atty Doc Prep Fee was in fact disclosed to Horn prior to loan origination. It is undisputed that defendants provided Horn with a Federal Truth-In-Lending statement, dated July 1, 2003, which listed a "Satisfaction Fee" of $125 as an element of the finance charge. (*See* Decl. of Alfred W.J. Marks, Apr. 17, 2008, Ex. F (hereinafter, "TIL Disclosure Statement").) Defendants claim that the Satisfaction Fee mentioned in the TIL Disclosure Statement refers to the same Atty Doc Prep Fee that was requested by the payoff letter sent to Horn, and offers affidavit testimony to that effect.[19] As a

---

[18] Plaintiffs repeatedly insist that the fact that defendants argue in part that the Atty Doc Prep Fee was disclosed operates as a concession that such charge was required to be disclosed as part of the finance charge under TILA, but that argument is beyond cavil. (Pls.' Supp. Mem. at 6-8; Pls.' Supp. Opp. Mem at 7-8.) It is well-accepted that litigants may present conflicting alternative arguments, and it is often a sign of effective advocacy. *See Greene v. United States*, 376 U.S. 149, 159 n.13 (1964) (rejecting assertion that use of alternative arguments functions as a concession); *see also United States v. Royal*, 7 F. Supp. 2d 96, 105-06 (D. Mass. 1998) ("Inconsistent arguments in the alternative are permissible advocacy. . . ."). Moreover, that the defendants claim to have started disclosing the Atty Doc Prep Fee as part of the finance charge does not establish that they were previously required to under TILA. In fact, because the plain language of the TILA accuracy tolerance provision includes a safe-harbor for overstating the finance charge, TILA covered entities have an incentive to over-disclose fees if they have uncertainty about whether it should be included in the finance charge, to avoid potential liability. *See* 15

U.S.C. § 1605(f)(1)(B) ("[T]he disclosure of the finance charge and other disclosures affected by any finance charge – (1) shall be treated as accurate for purposes of this subchapter if the amount disclosed as the finance charge – . . . (B) is greater that the amount required to be disclosed under this subchapter[.]").

[19] (Aff. of Christine Haase, Apr. 17, 2008, ¶ 5 ("The terms Atty Doc Prep Fee, Attorney Document Preparation Fee and Satisfaction Fee are terms that are used interchangeably by Astoria Federal Savings to describe fees paid by Astoria Federal Savings to the law firm of Thomas & Graham LLP for preparing a borrower's Satisfaction of Mortgage after a loan is paid off or satisfied."); ¶ 9 ("The payoff statement and cashiering advice for the Horn Loan (Exs. I and J to Marks Decl.) indicate that the Horns were charged and paid three fees, including an 'Atty Doc Prep Fee' of $125, in

threshold matter, the Court agrees that if the affidavit testimony offered by defendants is believed, then that would compel a finding that the Atty Doc Prep Fee was in fact disclosed as part of the finance charge, which would in turn entitle them to summary judgment as against Horn's TILA claim. *See, e.g., Davis v. Deutsche Bank Nat'l Trust Co.*, No. 05-CV-4061, 2007 WL 3342398, at *6 (E.D. Pa. Nov. 8, 2007) (granting summary judgment after determining that certain fees were in fact disclosed to borrowers, and so finance charge variance did not surpass the § 1605(f) accuracy tolerance threshold); *see also Stump v. WMC Mortgage Corp.*, No. Civ. A. 02-326, 2005 WL 645238, at *3, 8 (E.D. Pa. Mar. 16, 2005) (finding that disclosure in TILA disclosure statement of $326 "Settlement or Closing Fee to Escrow Title" included, as a factual matter, a $225 "settlement of closing fee" paid to law firm; summary judgment granted on TILA claim because finance charge variance did not surpass the § 1605(f) accuracy tolerance threshold). However, the Court finds that there is a material issue of disputed fact regarding whether or not the TIL Satisfaction Fee refers to the same Atty Doc Prep Fee, based on a combination of the facts that: (1) the fees were listed under different names; *and* (2) it is undisputed that the TIL Disclosure Statement listed the Satisfaction Fee as a "prepaid" finance charge, but was demanded again by the payoff letter. (*See* TIL Disclosure Statement; *see also* Decl. of Joseph S. Tusa,

Apr. 25, 2008, Ex. 11 (document entitled "Truth-In-Lending Prepaid Items Worksheet" for Horn Loan, listing $125 Satisfaction fee as prepaid item).) Defendants counter with testimony that this Satisfaction Fee was actually not prepaid by Horn, and that the TIL Disclosure Statement's characterization of that fee as prepaid was a mistake,[20] but the Court cannot grant summary judgment to defendants on the basis that the Atty Doc Prep Fee was in fact disclosed on this record. Although a jury could reasonably determine that the Satisfaction Fee and the Atty Doc Prep Fee refer to the same charge and credit defendants' testimony that the disclosure as a "prepaid" charge was an error, viewing the evidence in a light most favorable to plaintiffs, a jury could also reasonably determine that they referred to different fees, particularly if they find that the fee was already collected at closing and then demanded and collected again when Horn prepaid his mortgage. Accordingly, because there is a disputed issue of material fact regarding whether the Atty Doc Prep Fee was in fact properly disclosed as part of the finance charge in the TIL Disclosure Statement provided to Horn, defendants are not entitled to summary judgment as against his TILA claim on this basis.

Defendants are also not entitled to judgment as a matter of law based upon their

---

connection with satisfaction of that loan. This fee is the same fee as the $125 Satisfaction Fee disclosed to the Horns on their Federal Truth-In-Lending Disclosure Statement.").)

[20] (Aff. of Christine Haase, Apr. 17, 2008, ¶ 8 ("Although the $2,039.36 in other charges was listed on the line of the Horn TIL Disclosure entitled Prepaid Finance Charge, the $125 Satisfaction Fee was not prepaid at the time of the loan origination and was not collected from the Horns until the payoff and satisfaction of their loan.").)

argument that the Atty Doc Prep Fee was not includable as part of the finance charge because it was not incident to the extension of credit, but rather related to the extinguishment of debt. Judge Spatt has already correctly rejected defendants' argument and held the fact that the Atty Doc Prep Fee was collected following origination of the loan does not prevent it from being includable in the finance charge under TILA, noting that Regulation Z specifically directs that various post-origination fees are included.[21] Similarly unavailing is defendants' apparent argument that the Atty Doc Prep Fee was not incident to the extension of credit simply because it was related to the "extinguishment of debt" based on Horn's initiative to repay the loan, relying upon *Pechinski v. Astoria Federal Savings and Loan Association*, 238 F. Supp. 2d 640 (S.D.N.Y.), *aff'd*, 345 F.3d 78 (2d Cir. 2003). As Judge Spatt has already recognized in this case, the holding in the district court's decision in *Pechinski* required more than the mere fact that the fee at issue was associated with the termination of the debt obligation to the lender defendant; rather, the district court also specifically relied upon the fact that the fee at issue in that case was related to a service requested by the borrower — processing

fees regarding a refinancing with another lender — and would not have otherwise been required by the borrower in the lifespan of the loan. *See McAnaney*, 586 F. Supp. 2d at 586 ("*Pechinski* held that the fees were not finance charges because they were not required by the creditor); *see also Pechinski*, 238 F. Supp. 2d at 643 (holding that the charged assignment fee was not includable in the finance charge where it was "imposed because of plaintiffs' specific request that [defendant] assign the mortgage to another lending institution"). The critical inquiry in determining whether a fee is required to be included in the finance charge for TILA purposes is not whether it can be simply categorized as somehow relating to the extinguishment of debt, but rather, "whether the creditor only would have provided the loan with a guarantee that the mortgagor would pay the fee." *McAnaney I*, 357 F. Supp. 2d at 584 (citing *Pechinski*, 238 F. Supp. 2d at 644). It is entirely unpersuasive for defendants to claim that the Atty Doc Prep Fee was not a condition of credit in the Horn loan, where they otherwise point to language in the mortgage contract which they claim authorized collection of the fee. (*See* Decl. of Alfred W.J. Marks, Apr. 17, 2008, Ex. C at ¶ 23 ("I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.").) Moreover, defendants have steadfastly maintained that the fee may be assessed at loan satisfaction regardless of whether the loan is prepaid or proceeds to maturity, which plainly indicates that it is a charge

---

[21] *See McAnaney I*, 357 F. Supp. 2d at 586 ("Defendants['] argument that, as a matter of law, the fees cannot be considered finance charges because they were charged after the loan was issued misconstrues applicable regulations and case law. Regulation Z provides that certain fees charged after loan origination are finance charges, such as cancellation fees and mortgage insurance. Regulation Z also provides that satisfaction and recording fees are finance charges that are allowed to be excluded, but only if these charges are disclosed and reasonable.").

that was reasonably contemplated to be assessed during the life span of the mortgage issued to Horn. (Aff. of William Conboy, Dec. 15, 2006, ¶ 40 ("The Facsimile Fee, Recording Fee and Attorney Doc Prep Fee would have and could have been assessed regardless of whether Plaintiffs prepaid their loans or held them to maturity.").) Based on these facts, the instant case is plainly distinguishable from *Pechinski,* and defendants are not entitled to summary judgment on the basis that the Atty Doc Prep Fee is not incident to the extension of credit.

Finally, the Court finds that there exist disputed issues of material fact which preclude granting summary judgment to defendants on the ground that the Atty Doc Prep Fee should be excluded from the finance charge based upon the statutory exclusion for document preparation fees. The exclusion which defendants rely upon is codified at 15 U.S.C. § 1605(e), and provides that:

> The following items, when charged in connection with any extension of credit secured by an interest in real property, shall not be included in the computation of the finance charge with respect to that transaction: . . . (2) Fees for preparation of loan-related documents.

15 U.S.C. § 1605(e). It is undisputed that the Atty Doc Prep fee was related to a loan-related document, and the Horn Loan was secured by an interest in real property, so it is eligible for the § 1605(e)(2) exclusion, provided that additional requirements imposed by Regulation Z are satisfied, that the document preparation fee was both (1) bona fide; and (2) reasonable. *See* 12 C.F.R. § 226.4(c)(7) ("Real-estate related fees. The

following fees in a transaction secured by real property or in a residential mortgage transaction [are excluded from the finance charge], *if the fees are bona fide and reasonable in amount*: . . (ii) Fees for preparing loan-related documents, such as deeds, mortgages, and reconveyance or *settlement documents*.") (emphasis added); *see also McAnaney I*, 357 F. Supp. 2d at 583-84 (noting that document preparation fees for loan-related documents may be excluded if bona fide and reasonable).[22] As

---

[22] Plaintiffs incorrectly assert that Judge Spatt has previously declared in this case that attorney document preparation fees must be included in the finance charge, as a matter of law. In fact, Judge Spatt explicitly acknowledged the availability of the exclusion for the preparation of loan-related documents when discussing the TILA statutory framework. *See McAnaney I*, 357 F. Supp. 2d at 583-84 ("In addition, the following fees related to residential mortgage transactions need not be disclosed if they are bona fide and reasonable: . . . (2) fees for preparing loan-related documents, such as deeds, mortgages, and reconveyance or settlement documents. . . ") (citing 12 C.F.R. § 226.4(c)). In support of their contention that Judge Spatt found that the Atty Doc Prep Fee should have been required to be included in the finance charge as a matter of law, plaintiffs cite Judge Spatt's parenthetical description of the Sixth Circuit's decision in *Inge v. Rock Financial Corporation*, 281 F.3d 613 (6th Cir. 2002), as standing for the proposition that the case "allow[ed] a claim under TILA for document preparation and recording fees." (Pls.' Supp. Opp. Mem. at 8-9 (quoting *McAnaney*, 357 F. Supp. 2d at 585 (citing *Inge*, 281 F.3d at 623)).) However, *Inge* did *not* establish that document preparation fees at issue in the instant case must always be included in the TILA finance charge as a matter of law, but merely denied a motion to dismiss regarding a document preparation fee because the complaint included allegations that

an initial matter, defendants have offered affidavit testimony that the $125 Atty Doc Prep Fee was set by the law firm of Thomas & Graham LLP, consistent with both their standard billing rates and prevailing local market rates for preparing loan satisfaction documents,[23] and plaintiffs have not proffered any evidence which controverts this testimony of reasonableness. *See, e.g., Brannam v. Huntington Mortgage Co.*, 287 F.3d 601, 606 (6th Cir. 2002) (finding no genuine issue of material fact as to the reasonableness of document preparation fee where defendants offered evidence that the rate was reasonable market rate and plaintiff failed to offer evidence to the contrary; affirming grant of summary judgment on TILA claim based upon document preparation exclusion to finance charge). That said, the Court finds that there is a

material issue of disputed fact regarding whether the fee was bona fide or reasonable, given the fact that there is a material issue of disputed fact regarding whether defendants demanded and collected the Atty Doc Prep Fee from Horn at loan prepayment in violation of their contractual commitments, as well as regarding whether the fee was collected twice. As discussed *supra*, a jury could reasonably determine that the Atty Doc Prep Fee demanded in the payoff letter and Satisfaction Fee listed in the TIL Disclosure Statement referred to distinct fees, and that the Satisfaction Fee was already prepaid, and so any additional demand for the Atty Doc Prep Fee functioned as a prepayment penalty, in contravention of the terms of the loan agreements between Horn and defendants. (Decl. of Joseph S. Tusa, Apr. 25, 2008, Ex. 5 at § 5 ("[Borrower] may make a Full Prepayment of Partial Prepayments without paying any Prepayment charge.").) If the fee was collected in breach of contract, it cannot be fairly said to be bona fide, and if it was collected twice, it cannot be fairly said to be either bona fide or reasonable for the purposes of the § 1605(e)(2) exclusion. *See, e.g., McMaster v. CIT Group/Consumer Fin. Inc.*, No. 04-339, 2006 WL 1314379, at *4 (E.D. Pa. May 11, 2006) (finding existence of disputed issues of fact regarding whether fee was bona fide and reasonable where evidence existed that borrower was double charged for particular service); *see also Therrien v. Resource Fin. Group, Inc.*, 704 F. Supp. 322, 327 (D.N.H. 1989) ("[D]ouble charges are neither bona fide nor reasonable."). Accordingly, defendants are not entitled to summary judgment based

---

the document preparation fee was not reasonable. *See* 281 F.3d at 623 ("Plaintiff's complaint is not so lacking as to foreclose any recovery for failure to disclose the document preparation fees. For instance, Plaintiff alleges that the document preparation fee was not reasonable."). *Inge* acknowledged the potential applicability of the statutory exclusion if the charge was reasonable and bona fide, but that resolution of that issue "invites some degree of inquiry into the facts and circumstances of the case, generally inappropriate at the pleadings stage, although perhaps resolveable on summary judgment after discovery." *Id.* There is nothing inconsistent with *Inge* or Judge Spatt's earlier decision in this case in analyzing whether the undisputed record evidence now supports application of the exclusion for the preparation of loan-related documents to the Atty Doc Prep Fee.

[23] (Aff. of John M. Graham III, Esq., Dec. 14, 2006, ¶¶ 3-9; Aff. of William Conboy, Dec. 15, 2006, ¶¶ 37-39.)

upon application of the document preparation exclusion.[24]

In sum, defendants are not entitled to summary judgment regarding Horn's TILA claim based on any of their alternative arguments. In addition, the Court finds that plaintiffs' cross-motion for summary judgment on Horn's TILA claim is also unwarranted, because a jury could reasonably determine that either: (a) the Atty Doc Prep Fee was in fact disclosed to Horn as part of the finance charge as the "Satisfaction Fee" in the TIL Disclosure Statement; or (b) that it was not in fact double-charged to Horn and otherwise collected in compliance of the contract, therefore qualifying it to be a reasonable and bona fide fee for the preparation of loan-related documents under the § 1605(e)(2) exclusion. If either of these determinations are made, then the TILA claim falls within the § 1605(f) accuracy tolerance threshold, and defendants would not be liable to Horn on his TILA claim as a matter of law.[25]

---

[24] As discussed *infra*, the Court finds that there exist disputed issues of material fact regarding whether the contracts of other class members were breached when the Atty Doc Prep Fee was collected. To the extent that any other class members with timely TILA claims have a viable breach of contract claim, summary judgment would not be warranted on their TILA claims, because the collection of a document preparation fee would not be bona fide for the purposes of the § 1605(e)(2) exclusion when it is collected in violation of a contractual obligation.

[25] The Court notes that plaintiffs are also proceeding on the alternative theory that the Disputed Fees were undisclosed prepayment penalties. *See McAnaney I*, 357 F. Supp. 2d at 584; *see also* 15 U.S.C. § 1638 (requiring

## C. HOEPA Claim

Defendants move for summary judgment on named plaintiff Horn's claim alleged under the Home Ownership and Equity Protection Act of 1994 ("HOEPA"), 15 U.S.C. § 1369 (a component of TILA), specifically asserting that the Horn loan does not qualify for protection under the plain terms of the statute.[26] (Defs.' Supp. Mem. at 13-14.) For the reasons stated below, the Court agrees.

HOEPA prohibits the attachment of prepayment penalties to certain types of mortgages, as defined by the statute. *See* 15 U.S.C. § 1639(c)(1)(A) ("A mortgage referred to in section 1602(aa) of this title may not contain terms under which a consumer must pay a prepayment penalty for paying all or part of the principal before the date on which the principal is due.") The statutory definition of HOEPA-covered mortgages includes loans that are secured by a consumer's principal dwelling, but specifically carves out residential mortgage transactions under its plain terms, which includes purchase money mortgages. *See* 15 U.S.C. § 1602(aa) ("A mortgage referred to in this subsection means a consumer credit transaction that is secured by the consumer's principal dwelling, *other than a residential*

---

disclosure of prepayment penalties); *accord* 12 C.F.R. § 226.18. Plaintiffs have indicated that they are only moving for summary judgment on whether defendants are liable as a matter of law for not disclosing the Disputed Fees as part of the finance charge. (*See* Pls.' Supp. Opp. Mem. at 7 n.3.)

[26] As stated *supra*, Horn is the only remaining named plaintiff alleging a claim under HOEPA.

*mortgage transaction*, a reverse mortgage transaction, or a transaction under an open end credit plan. . . ") (emphasis added); *see also* 15 U.S.C. § 1602(w) (defining "residential mortgage transaction" as "a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling").

Because it is undisputed that the Horn loan is a purchase money mortgage loan, Horn's HOEPA claim fails as a matter of law. *See, e.g.*, *Llaban v. Carringon Mortgage Servs., LLC*, No. 09-CV-1667-H-POR, 2009 WL 2870154, at *5 (S.D. Cal. Sept. 3, 2009) (dismissing HOEPA claims where loan at issue was a purchase money mortgage); *Johnson v. Scala*, No. 05-CV-5529 (LTS), 2007 WL 2852758, at *4 (S.D.N.Y. Oct. 1, 2007) (dismissing HOEPA claim where loan at issue was "clearly a purchase money mortgage loan and not a second loan or a refinancing"). Accordingly, the Court finds that summary judgment on Horn's HOEPA claim is warranted.

D.  State Law Claims – Preemption

Defendants argue that plaintiffs' state law claims are preempted by federal law, specifically by the Home Owners' Loan Act, 12 U.S.C. §§ 1461-1460 (hereinafter, "HOLA"), and its implementing regulations, 12 C.F.R. § 560.1, *et seq.* For the reasons set forth below, the Court agrees that plaintiffs' statutory claims under New York Real Property Law § 274-a and New York Real Property Actions and Proceedings Law § 1921 are preempted against all remaining defendants.[27] However, the Court finds that plaintiffs' New York common law claims for breach of contract, unjust enrichment

---

[27] Plaintiffs assert that HOLA preemption only potentially applies to defendants that are federal savings associations, namely Astoria Federal and LISB. While plaintiffs are correct that HOLA governs the activities of federal savings associations, HOLA explicitly authorizes extension by Office of Thrift Supervision ("OTS") of regulation to subsidiaries of federal savings associations, and the implementing regulations specifically indicate that the identical preemption analysis would apply to Astoria Mortgage because it is an operating subsidiary of Astoria Federal. *See* 12 U.S.C. § 1464(d)(7)(D) ("[I]f a savings association, a subsidiary thereof, or any savings and loan affiliate or entity . . . that is regularly examined or subject to examination by the Director, causes to be performed for itself, by contract or otherwise, any service authorized by this chapter . . . whether on or off its premises—(i) such performance shall be subject to regulation and examination by the Director to the same extent as if such services were being performed by the savings association on its own premises. . ."); *see also* 12 C.F.R. 559.3(n)(1) ("State law applies to operating subsidiaries only to the extent it applies to [a federal savings and loan association]."); *cf. State Farm Bank v. Reardon*, 539 F.3d 336, 345-46 (6th Cir. 2008) (holding that HOLA preemption applies to state laws targeting the activities of exclusive agents of federal savings associations); *accord State Farm Bank, F.S.B. v. Burke*, 445 F. Supp. 2d 207, 219-220 (D. Conn. 2006). Because, as discussed *supra*, the bank holding company defendants have been dismissed from this lawsuit, the Court need not consider plaintiffs' argument that HOLA preemption does not apply to bank holding companies. The preemption analysis discussed in this section applies equally to all defendants that remain in this case.

and fraud, and the statutory claim under New York General Business Law § 349 are *not* preempted by HOLA and its implementing regulations.

Federal preemption of state statutory and common law occurs "where Congress has expressly preempted state law, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law, or where federal law conflicts with state law." *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 313 (2d Cir. 2005). Federal statutes and regulations have similar preemptive effect on state and common law. *See Flagg v. Yonkers Savings and Loan Ass'n, FA*, 396 F.3d 178, 182 (2d Cir. 2005) ("Federal regulations have no less preemptive effect that federal statutes.").

HOLA was enacted in 1933, as a reaction to the Great Depression, "to provide emergency relief with respect to home mortgage indebtedness," as a "radical and comprehensive response to the inadequacies of the existing state systems." *Fidelity Fed. Sav. and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 159-60 (1982). The statute provided for the creation of federal savings and loan associations, and delegated authority to regulate those associations to the Federal Home Loan Bank Board, and by virtue of that authority preempt conflicting state law. *Id.* at 159; *In re Ocwen Loan Servicing, LLC Mortg. Servicing Litig.*, 491 F.3d 638, 642 (7th Cir. 2007). In 1989, Congress replaced this entity with the Office of Thrift Supervision (hereinafter, "OTS"). *See Sec. Sav. & Loan Ass'n v. Director, Office of Thrift Supervision*, 960 F.2d 1321 n.8 (5th Cir. 1992) (noting that the Federal Home Loan Bank Board was replaced by OTS). Pursuant to HOLA, the Director of OTS has broad authority to promulgate regulations regarding federal savings associations. *See* 12 U.S.C. §§ 1463(a), 1464(a). "This is an extremely broad grant of power that provides ample authority for the [OTS] Director's efforts to enforce consistent, nationwide regulations affecting lending practices, by preempt[ion]." *Flagg*, 396 F.3d at 183; *see Fidelity*, 458 U.S. at 161-62 ("Congress expressly contemplated, and approved, [OTS'] promulgation of regulations superseding state law."); *see also* 12 C.F.R. § 560.2(a) ("Pursuant to sections 4(a) and 5(a) of the HOLA, 12 U.S.C. 1463(a), 1464(a), OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations when deemed appropriate to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA . . . OTS hereby occupies the entire field of lending regulation for federal savings associations.").

The regulations set forth the analytical framework that should be utilized to determine whether a state statute, regulation, ruling, order or judicial decision is preempted. Pursuant to 12 C.F.R. § 560.2(a), state law that affects the activities of federal savings associations are broadly preempted, except where otherwise provided in the regulations. Subsection (b) proceeds to provide illustrative examples of state laws that are preempted, which include, *inter alia*, state laws that impose requirements upon "[l]oan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees," 12 C.F.R. § 560.2(5), and also "[p]rocessing, origination, servicing, sale or purchase of, or investment or

participation in, mortgages," 12 C.F.R. § 560.2(10). Subsection (c) then proceeds to expressly carve out certain classes of state laws from its preemptive reach where they "only incidentally affect the lending operations" of covered entites:

State laws of the following types are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section: (1) Contract and commercial law; (2) Real property law; (3) Homestead laws specified in 12 U.S.C. 1462a(f); (4) Tort law; (5) Criminal law; and (6) Any other law that OTS, upon review, finds: (i) Furthers a vital state interest; and (ii) Either has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section.

12 C.F.R. § 560.2(c). According to OTS, the preemption analysis under § 560.2 is intended to proceed as follows:

[T]he first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly.

Any doubt should be resolved in favor of preemption.

*Cedeno v. IndyMac Bancorp, Inc.*, No. 06-CV-6438 (JGK), 2008 WL 3992304, at *6 (S.D.N.Y. Aug. 26, 2008) (quoting 61 Fed. Reg. 50951, 50966-50967 (Sept. 30, 1996)).

Analytical results under each prong are generally consistent, however, because subsection (c) does not confer broad immunity from preemption for all state laws based on the extremely broad categories listed; rather, that carve out only applies "to the extent that they only incidentally affect the lending operations of Federal savings associations." 12 C.F.R. § 560.2(c); *see also In re Ocwen*, 491 F.3d at 643 ("The list in subsection (c) is long and the categories it covers — contract and commercial law, tort law, and so forth — are very broad. It would not do to let the broad standards characteristic of such fields morph into a scheme of state regulation of federal S & Ls. Hence the statement in subsection (c) that state laws escape preemption only 'to the extent that they only incidentally affect the lending operations of Federal savings associations . . .'") (citing 12 C.F.R. § 560.2(c)). As Judge Posner has described, the divide between state law preempted under subsection (b) and those not preempted under subsection (c) is "both intuitive and reasonably clear":

The Office of Thrift Supervision has exclusive authority to regulate the savings and loan industry in the sense of fixing fees (including penalties), setting licensing requirements, prescribing certain terms in mortgages, establishing requirements for disclosure of credit information to customers, and setting standards for processing and servicing mortgages. But though it has some prosecutorial

powers ancillary to its regulator functions, the Office has no power to adjudicate disputes between the S & Ls and their customers.

*In re Ocwen*, 491 F.3d at 643 (internal citations and quotation marks omitted).

However, before proceeding to analyze plaintiffs' individual state law claims to determine whether they are preempted, the Court notes that plaintiffs have levied a number of general arguments that preemption does not apply at all in the instant case under HOLA and 12 C.F.R. § 560.2, specifically asserting: (1) preemption is not applicable to state law claims for conduct that is found to be in violation of federal law; (2) preemption under 12 C.F.R. § 560.2 only applies to the "lending" activities of HOLA-covered institutions, and defendants were only engaging in "servicing" activities; (3) defendants' agreements incorporate state law and so they cannot be immune from their effect because of federal preemption; and (4) recent United States Supreme Court authority undercuts the preemptive extent of HOLA and 12 C.F.R. § 560.2. For the reasons set forth below, all of these arguments are without merit.

First, the Court rejects plaintiffs' argument that state law claims regarding conduct which violates federal law cannot be preempted under § 560.2 as a matter of law. In making this argument, plaintiffs attempt to draw support from two sources: (1) a statement by the Second Circuit in *Flagg v. Yonkers Savings and Loan Association, FA*, 396 F.3d 178, 185 (2d Cir. 2005) that "OTS cannot . . . promulgate rules and regulations that are contrary to [the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. 2601, *et seq.*]"; and (2) the text of 12 C.F.R. § 560.2(a), which

states that "federal savings associations may extend credit *as authorized by federal law*, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities . . ." (emphasis added). As an initial matter, the Court does not read *Flagg* as standing for anything more than the common-sense proposition that OTS (or any other federal regulatory agency) cannot promulgate regulations that are in conflict with an Act of Congress, such as RESPA. There is nothing inconsistent with a regulation such as 12 C.F.R. § 560.2 that outlines the extent of state preemption and a federal statute such as TILA or HOEPA that describes acts which are in violation of federal law; a party can consistently be held liable under the federal law, but immune from a preempted state law. Next, although plaintiffs make a creative textual argument under § 560.2(a), the Court cannot adopt plaintiffs' proposed interpretation of that statute. Under plaintiffs' reading, any *act* by a HOLA-covered entity which violated any portion of TILA or any other federal statute no matter how minute or technical, would cause the entity to lose its immunity from any and all state law, which would otherwise be preempted. Such an interpretation would be in direct conflict with the express purpose stated within § 560.2(a) itself, "[t]o give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation," because federal savings associations would be required to be wary of compliance with the laws of the fifty states in the event that some aspect of their activity was found deficient under some provision of federal law. *See Munoz v. Fin. Freedom Senior Funding Corp.*, 573 F. Supp. 2d 1275, 1282 (C.D. Cal. 2008) ("The purpose of the OTS preemption regulations is to foreclose . . . [a] potentially inconsistent and

contradictory state-by-state regulatory scheme.") (citing 12 C.F.R. § 560.2(a)). Accordingly, the Court interprets § 560.2(a) in the manner consistent with its language as a whole – if a state law is preempted under the terms of 12 C.F.R. § 560.2, it does not apply to HOLA-covered institutions, regardless of whether the state law claim is addressing activity which violates federal law. *See, e.g.*, *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 248 n.11 (2d Cir. 2007) (noting "cardinal rule" of statutory construction "that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context.") (citation and internal quotation marks omitted); *see also United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 879 F.2d 20, 24 (2d Cir. 1989) ("In ascertaining the proper construction of a specific statutory provision, it is also appropriate . . . to view the disputed language in context; that is, to interpret the specific provision in a way that renders it consistent with the tenor and structure of the whole act or statutory scheme of which it is a part.").[28]

Similarly, contrary to plaintiffs' suggestions, defendants are immune from state law under the preemptive effect of HOLA and its implementing regulations, notwithstanding the fact that defendants sold some of the mortgages on the secondary market and only continued to *service* some of plaintiffs' loans. The remaining defendants are HOLA-covered entities, and 12 C.F.R. § 560.2(b) explicitly lists servicing activities as illustrative examples of functions that are protected from state regulations through preemption. *See* 12 C.F.R. §§ 560.2(b)(6) ("servicing fees"), (10) ("servicing"). Accordingly, to the extent that defendants only serviced some of the class members' loans after selling them on the secondary market, state laws may still be preempted, if otherwise warranted under the standards governing preemption.

The Court also rejects plaintiffs' assertion that defendants incorporated state law into their contracts, such that they are not entitled to avail themselves of the preemptive effect of HOLA and its implementing regulations. "While contracts may incorporate particular laws as contract terms, *the contract must do so with specificity*." *Flagg*, 396 F.3d at 186 (emphasis added). In support of their position that defendants' contracts incorporated state law, plaintiffs point to the fact that defendants used uniform Fannie Mae and Freddie Mac mortgage agreements,

---

[28] The Court also declines plaintiffs' invitation to interpret § 560.2(a) in a manner which would effectively turn the federal preemption doctrine on its head, particularly in an area in which it is well-settled that Congress explicitly provided broad preemptive authority. *See* 12 U.S.C. § 1463(a)(1) (conferring authority on OTS "preemptive of any state law purporting to address the subject of the operations of a Federal savings association"); *see also* 12 C.F.R. § 560.2(a) ("OTS hereby occupies the entire field of lending regulation for federal savings associations."). This Court intends to implement § 560.2(a) in the same manner as scores of other courts before it; HOLA-covered defendants may be found potentially liable for violations of federal law, but not potentially liable for state law claims regarding the same activity if the

state law is preempted under 12 C.F.R. § 560.2. *See, e.g. Bassett v. Ruggles*, No. CV-F-09-528 (OWW/SMS), 2009 WL 2982895 (E.D. Cal. Sept. 14, 2009) (denying motion to dismiss TILA claim, but granting motion to dismiss various state law claims as preempted); *see also Poskin v. TD Bankworth, N.A.*, No. 06-463, 2009 WL 2981963 (W.D. Pa. Sept. 11, 2009) (same).

and the following language from the Fannie Mae's Selling Guide:

> Compliance under Applicable Laws (6/30/02): We require each Fannie Mae approved lender (and any subservicer or third party originator it uses) to be aware of, and in full compliance with, all federal, state, local laws (including statutes, regulations, ordinances, administrative rules and orders that have effect of law and judicial rules and opinions) *that apply* to any of its origination, selling or servicing practices or other business practices (including the use of technology) that may have a material effect on us.

(*See* Decl. of Joseph S. Tusa, Mar. 2, 2007, Ex. AA, Part I, Ch. 3, § 306 (emphasis added).) Further, plaintiffs point to Astoria Federal's agreement with Fannie Mae, which states that "[i]t is a breach if [Astoria Federal] does not comply with this Contract or [Fannie Mae's Selling] Guides through any act of omission . . ." and that Astoria Federal was required to comply with "*applicable* federal and state laws, regulations or other requirements on consumer credit, equal credit opportunity or truth-in-lending." (*See* Decl. of Joseph S. Tusa, Dec. 20, 2006, Ex. 43 at p. 8, § IV(A)(15) & p. 13, § VIII(A)(2) (emphasis added).) The plain text of these provisions (assuming *arguendo* that they are binding upon defendants' lending activities with plaintiffs) only require compliance to the extent that such laws are *applicable*. State laws that are subject to preemption under the terms of HOLA and its implementing regulations are manifestly *not applicable* to federal savings associations, and not specifically incorporated into defendants' agreements.

Finally, the Court rejects plaintiffs' arguments that the preemptive effect of HOLA and its implementing regulations are limited by the recent Supreme Court decisions in *Wyeth v. Levine*, 129 S. Ct. 1187 (2009) and *Cuomo v. Clearing House Association, L.L.C.*, 129 S. Ct. 2710 (2009).[29] Neither case involved or discussed the preemptive effect of HOLA and its implementing regulations. In *Wyeth*, the Supreme Court addressed the preemptive effect of the Food, Drug and Cosmetics Act ("FDCA") on state law failure to warn claims, and had nothing to do with the regulation of federal savings associations, or even the banking industry generally. *See* 129 S. Ct. at 1193. In finding the state claim not preempted, the Supreme Court found that a statement in a preamble of a regulation issued by the Food and Drug Administration ("FDA"), was insufficient to demonstrate intent to preempt state law, particularly in light of contrary Congressional intent and the FDA's own long standing position that state law provides a complementary scheme of regulation. *See id.* at 1199-1204. In the case of HOLA, by contrast, the Supreme Court has previously found an expansive intent to promote a single scheme of regulation over federal savings associations by delegating broad authority to OTS to preempt state law. *See Fidelity*, 458 U.S. at 161-62 ("Congress plainly envisioned that federal savings and loans would be governed by what [OTS] — not any particular State — deemed to be the 'best practices' . . . the

---

[29] Plaintiffs asserted their arguments under *Wyeth* and *Cuomo* in the supplemental letters sent to the Court, dated March 17, 2009 and June 30, 2009. The Court has considered those letters, as well as defendants' response letters, dated March 19, 2009 and July 2, 2009, respectively.

statutory language suggests that Congress expressly contemplated, and approved, the [OTS'] promulgation of regulations superseding state law.").[30] Similarly, the

Court finds *Cuomo* inapplicable, as it addressed whether the Office of the Comptroller of the Currency overstepped its authority in a regulation it issued, under the statutory terms of the National Bank Act ("NBA"), and did not address preemption under HOLA and its implementing regulations. *See Gawry v. Counrywide Home Loans, Inc.*, -- F. Supp. 2d --, No. 07-CV-322, 2009 WL 1954717, at *6 (N.D. Ohio July 6, 2009) ("*Cuomo* does not appear to extend to HOLA").[31]

Having rejected plaintiffs' general arguments against preemption, the Court proceeds to examine, on a claim by claim basis, within the 12 C.F.R. § 560.2 framework, "'which claims fall on the

---

[30] In *Wyeth*, the Supreme Court noted that the FDCA had included an express preemption clause as of 1976 specifically regarding medical devices, but did not enact a broader preemption provision. *See* 129 S. Ct. at 1200. The Court found that Congress lacked the intent to broadly preempt state law claims where it remained silent for decades while being aware of the prevalence of state tort litigation. *See id.* Plaintiffs argue that Congress similarly lacked an intent to broadly preempt state law claims against federal savings associations based upon the fact that HOLA incorporates a specific preemption provision regarding state usury laws. *See* 12 U.S.C. § 1463(g). However, the Court is not persuaded by this argument, because the Supreme Court rejected this precise argument in *Fidelity*, and discerned an intent on the part of Congress to enable OTS to broadly preempt state laws as they impacted the lending activities of federal savings associations:

> Appellees, however, point to the various sections of the HOLA explicitly pre-empting and incorporating state law, and contend that [OTS' predecessor] has no additional authority to adopt regulations displacing state law. Although Congress made decisions about the applicability of certain aspects of state law to federal savings and loans, these provisions do not imply that Congress intended no further pre-emption of state law. Rather, Congress invested [OTS' predecessor] with broad authority to regulate federal savings and loans so as to effect the statute's purposes, and plainly indicated that [OTS' predecessor] need not feel bound by existing state law. § 5(a) of the HOLA, 12 U.S.C. § 1464(a). We cannot read this broad delegation of power as confining the [OTS' predecessor]'s authority to those areas 'specifically described by the Act's other provisions.'

*Fidelity*, 458 U.S. at 162-64 (footnotes and citations omitted). The Court does not read *Wyeth* to overturn *Fidelity* with respect to Congress' intent regarding HOLA, given that they dealt with different statutes with completely different histories. Moreover, the cases are distinguishable, given that *Wyeth* relied in part on the fact that the FDA had shown a willingness to allow state claims to proceed as complementary to the regulatory scheme, whereas OTS has consistently sought to assert broad preemption over state law claims. *See Wyeth*, 129 S. Ct. at 1202 ("In keeping with Congress' decision not to pre-empt common-law tort suits, it appears that the FDA traditionally regarded state law as a complementary form of drug regulation."). In fact, the "silence" of Congress in *not* legislating to curb OTS' authority to preempt state regulation in the decades since *Fidelity* issued and the history of courts finding state law claims alleged against federal savings associations preempted under OTS regulation is probative of Congress' intent to allow OTS to maintain such authority.

[31] The Court has considered the remainder of plaintiffs' arguments that preemption is generally inapplicable, and has found them all to be without merit.

regulatory side of the ledger and which, for want of a better term, fall on the common law side.'" *Cedeno*, 2008 WL 3992304, at *7 (quoting *In re Ocwen*, 491 F.3d at 644).

### 1. New York Real Property Law § 274-a

Plaintiffs allege violation of Section 274-a of the New York Real Property Law, which entitles an owner of real property that is encumbered by a mortgage to receive, upon demand, payoff statements at no charge. *See* N.Y. Real. Prop. Law § 274-a (hereinafter, "NYRPL § 274-a"). *See Dougherty v. N. Fork Bank*, 301 A.D.2d 491, 491-92 (N.Y. App. Div. 2003) (finding that defendant violated NYRPL § 274-a by charging plaintiff for fax and quote fee for payoff statement); *Negrin v. Norwest Mortgage, Inc.*, 263 A.D.2d 39, 44-48 (N.Y. App. Div. 1999) (holding that § 274-a prohibits imposition of fees for payoff letters; plaintiff alleged cause of action regarding imposition of Facsimile Fee for payoff statement). By prohibiting the assessment of fees related to the provision of a payoff statement, a loan-related document, § 274-a plainly imposes a substantive requirement when applied to federal savings associations regarding "[l]oan-related fees," thereby making preemption appropriate pursuant to 12 C.F.R. § 560.2(b)(5). *See Cassese v. Wash. Mut., Inc.*, 255 F.R.D. 89, 94 (E.D.N.Y. 2008) (noting that the court had previously dismissed NYRPL § 274-a claim as preempted under 12 C.F.R. § 560.2(b)(5) as a state law imposing a requirement regarding a loan-related fee);[32]

[32] The prior Memorandum & Order referenced by the *Cassese* opinion can be found at docket entry number 125, dated September 7, 2007, under index number 05-CV-2724 (ADS) (ARL) in the United States District Court for the Eastern District of New York (hereinafter, "*Cassese* MTD Opinion"). The relevant

*see also* Opinion of OTS Chief Counsel, P-2000-6, Apr. 21, 2000, *available at* 2000 WL 1455751 (finding that HOLA preempts NYRPL § 274-a);[33] *cf. Crespo v. WFS Fin.,*

discussion regarding preemption of the NYRPL § 274-a claim can be found at pages 28-29 of that Memorandum & Order.

[33] The OTS Opinion specifically provides:

Here, the fee the Association charges for faxing loan payoff statements, at the borrower's request, is a loan-related fee. The Association charges this fee for providing its loan customers the convenience of rapid receipt of a payoff statement containing information concerning all outstanding amounts on, and the payoff value of, their loans. The payoff statement is an integral part of the lending process as it provides the information necessary to satisfy the debt and extinguish the extension of credit. Therefore, under § 560.2(b)(5), to the extent § 274-a(2) would prohibit the Association from charging a borrower for faxing a loan payoff statement requested by the borrower, § 274-a(2) does not apply to the Association.

Opinion of OTS Chief Counsel, P-2000-6, 2000 WL 1455751. The Court agrees with the OTS Opinion Letter, which is entitled to deference and "controlling weight" as the agency's interpretation of its own regulations, provided that it is not clearly erroneous or inconsistent with the regulations, which it is not. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 780 (2d Cir. 2002) (according "controlling weight" to policy letter drafted by Department of Education's Office of Special Education Programs regarding a Department of Education regulation); *State Farm Bank, F.S.B. v. Burke*, 445 F. Supp. 2d 207, 216 (D. Conn. 2006) (finding that "controlling weight" should be accorded to OTS opinion letters unless it is determined that OTS' interpretation is "plainly

*Inc.*, 580 F. Supp. 2d 614, 623 (N.D. Ohio 2008) (finding claim brought under Ohio statute which regulates that amount of fees that may be assessed for repossession of property preempted as imposing a requirement regarding loan-related fees under 12 C.F.R. § 560.2(b)(5)); *Boursiquot*, 323 F. Supp. 2d at 355 (finding Connecticut state law claims seeking relief for allegedly improperly assessed "fax/statement fee" as preempted as imposing a requirement regarding loan-related fees under 12 C.F.R. 560.2(b)(5)); *Haehl v. Wash. Mut. Bank, F.A.*, 277 F. Supp. 2d 933, 941 (S.D. Ind. 2003) (finding Indiana statute which restricted assessment of reconveyance fees preempted as imposing a requirement regarding loan-related fees under 12 C.F.R. § 560.2(b)(5)).[34]

Accordingly, plaintiffs' § 274-a claim is preempted against Astoria Federal, Astoria Mortgage, and LISB, the remaining defendants in this action, and does not survive summary judgment.

## 2. New York Real Property Actions & Proceedings Law § 1921

Plaintiffs allege violations of section 1921 of the New York Real Property Actions & Proceedings Law (hereinafter, "NYRPAPL § 1921"), which provides that "[a]fter payment of authorized principal, interest, and any other amounts due . . . a mortgagee of real property . . . must execute and acknowledge . . . a satisfaction of mortgage" which is to be recorded. A lender may be subjected to monetary penalties for failing to present a certificate of discharge for recording in a timely manner under the terms of the statute. *See id.*; *see also Cassese* MTD Opinion at 30. This claim also imposes a substantive, affirmative requirement on lenders to complete the satisfaction of a mortgage within a specific time frame, a requirement that, when applied to federal savings associations, directly impacts their lending activities, particularly with respect to the processing and servicing of mortgages, thereby making preemption warranted pursuant to 12 C.F.R. § 560.2(10). *See Cassese*, 255 F.R.D. at 94 (noting that the court had previously dismissed NYRPAPL § 1921 claim as preempted under HOLA); *accord Cassese* MTD Opinion at 30-31; *see also Molosky v. Wash. Mut. Bank*, No. 07-CV-11247, 2008 WL 183634, at *4 (E.D. Mich. Jan. 18, 2008) (finding M.C.L. § 565.41 claim, which requires mortgagees to file discharge of mortgage within statutory time period preempted under HOLA and its implementing regulations).[35]

erroneous" or "inconsistent with the regulation[s] in question"). Other courts frequently accord controlling weight to OTS opinion letters in determining the preemptive scope of HOLA and 12 C.F.R. § 560.2. *See, e.g.*, *Cedeno*, 2008 WL 3992304, at *6; *accord Burke*, 445 F. Supp. 2d at 221; *Binetti*, 446 F. Supp. 2d at 219-21; *Cassese* MTD Opinion at 29, 32.

[34]  As stated *supra*, because the Court has determined that the law imposes substantive requirements that call for preemption under 12 C.F.R. § 560.2(b), the Court is not required to address subsection (c). However, if the Court were to reach that question, it would find that as applied to this case, although the statute falls broadly within the category of a "[r]eal property law," it is ineligible for the exclusion from preemption under 12 C.F.R. § 560.2(c) because it plainly imposes particular requirements regarding the payoff statement that "more than incidentally affects" lending operations.

[35]  As stated *supra*, because the Court has determined that the law imposes substantive requirements that call for preemption under 12 C.F.R. § 560.2(b), the Court is not required to

Accordingly, plaintiffs' § 1921 claim is preempted against Astoria Federal, Astoria Mortgage, and LISB, the remaining defendants in this action, and does not survive summary judgment.

### 3. Breach of Contract

Plaintiffs assert a cause of action for breach of contract, alleging that the collection of the Disputed Fees was prohibited by their mortgage agreements with defendants. As set forth below, the Court concludes that the breach of contract claim is not preempted, because it is a "[c]ontract and commercial" law that does not "more than incidentally impact lending operations," pursuant to 12 C.F.R. § 560.2(c)(1).

The breach of contract claim, as opposed to the statutory claims asserted under NYRPL § 249-a or NYRPAPL § 1921, does not seek to impose specific substantive requirements upon the operations of defendants, apart from compliance with specific contractual obligations. It cannot be fairly said that the common law claim for breach of contract, which merely seeks to make defendants live up to the word of their agreements they sign with their customers, "more than incidentally affects" lending operations. The claim is therefore not preempted, pursuant to 12 C.F.R. § 560.2(c)(1). *See, e.g., Davis v. Chase Bank U.S.A., N.A.*, -- F. Supp. 2d --, No. 06-CV-4804 DDP (PJWx), 2009 WL 2868817, at *11 (C.D. Cal. Sept. 3, 2009) (holding breach of contract claim not preempted, noting that such a claim would "have at most an incidental effect on the exercise of Chase's lending powers . . . [s]uch a claim does not seek to force Chase to set its contracts in a certain way, but rather merely to *adhere* to the contracts it does create.") (emphasis in original); *see also Nava v. VirtualBank*, No. 08-CV-0069 (FCD), 2008 WL 2873406, at *9 (E.D. Cal. July 16, 2008) ("Defendants' lending practices will not be affected whatsoever by [a breach of contract claim]. Instead, it is defendants' practices of performing contractual obligations with good faith and fair dealing that might be affected"; breach of contract claim not preempted); *Reyes v. Downey Savings and Loan Ass'n, F.A.*, 541 F. Supp. 2d 1108, 1114 (C.D. Cal. 2008) ("[A] law against breach of contract will not be preempted just because the contract relates to loan activity."); *Binetti*, 446 F. Supp. 2d at 218-19 (noting that court had previously denied motion to dismiss contract claim as preempted under HOLA); *Cassese* MTD at 34-35 (holding breach of contract claim not preempted under HOLA).[36]

---

[36] In fact, to hold otherwise would allow a federal savings association to use preemption as a shield to avoid adherence to its contractual commitments. As Judge Posner has remarked:

> Suppose an S & L signs a mortgage agreement with a homeowner that specifies an annual interest rate of 6 percent and a year later bills the homeowner at a rate of 10 percent and when the homeowner refuses to pay institutes foreclosure proceedings. It would be surprising for a federal regulation to forbid the homeowner's state to give the homeowner a defense based on the mortgagee's breach of contract. Or if the mortgagee (or a

---

address subsection (c). However, if the Court were to reach that question, it would find that as applied to this case, although the statute falls broadly within the category of a "[r]eal property law," it is ineligible for the exclusion from preemption under 12 C.F.R. § 560.2(c) because it plainly imposes particular requirements regarding loan discharge that "more than incidentally affects" lending operations.

Defendants correctly point out that some courts have found breach of contract claims preempted under HOLA, but such holdings are the exception to the majority rule, and distinguishable from the instant case because they do not involve allegations of breach of specific contractual provisions. For example, in *Cedeno v. IndyMac BankCorp, Inc.*, No. 06-CV-6438 (JGK), 2008 WL 3992304, at *9 (S.D.N.Y. Aug. 26, 2008), the plaintiff alleged that she entered into a contract for mortgage services, including appraisal services, and that defendant provided materially inaccurate appraisal services because it allowed interested parties to influence the appraisal and valuation. However, the court explicitly noted that she was not able to point to any explicit provision of the contract which she alleged to be violated because it was undisputed that plaintiff received the appraisal which she paid for under the terms of the agreement. *Id.,* at *10. Plaintiff relied, rather, on a theory of breach that the implied covenant of good

faith and fair dealing inherent in the contract called for certain standards to be applied to the manner in which the appraisal was to be conducted. *Id.* However, asserted in such a fashion, the court found the claim to be attempting to impose a substantive requirement on the processing and origination of the mortgage, calling for preemption pursuant to 12 C.F.R. § 560.2(b)(10).[37] *Id.* In the instant case, unlike *Cedeno*, there is no attempt by plaintiffs to obtain an end-around the preemptive effect of HOLA and its implementing regulations by asserting that the contract contained implied affirmative duties that would impact lending operations, which a state statute or regulation could not directly accomplish pursuant to 12 C.F.R. §560.2. Instead, plaintiffs allege breach of specific, explicit contractual obligations that prohibited collection of the Disputed Fees.[38]

---

servicer like Ocwen) fraudulently represents to the mortgagor that it will forgive a default, and then forecloses, it would be surprising for a federal regulation to bar a suit for fraud. Some federal laws do create such bars, notably ERISA, see 29 U.S.C. §§ 1132(a), (e), but this is recognized as exceptional. Enforcement of state law in either of the mortgage-servicing examples above would complement rather than substitute for the federal regulatory scheme.

*In re Ocwen*, 491 F.3d at 643-44 (Posner, J.) (internal citations omitted); *see also Binetti*, 446 F. Supp. 2d at 218 (noting that OTS preemption of straightforward breach of contract claims could potentially insulate a defendant bank from liability for not adhering to the terms of its agreements).

---

[37] Similarly, in *Spears v. Washington Mutual, Inc.*, No. 08-CV-0868 (RMW), 2009 WL 2761331, at *5 (N.D. Cal. Aug. 30, 2009), the court considered a breach of contract claim again involving what plaintiff alleged to be a deficient appraisal. As in *Cedeno*, the plaintiff did not point to a specific contractual obligation that was breached, but rather claimed that the appraisal was materially deficient because it did not comply with standards of the Uniform Standards of Professional Appraisal Practice ("USPAP"). *See id.,* at *6. The USPAP standards formed the identical basis for claims under California's Unfair Competition Law and Consumer Legal Remedies Act which the court had previously found preempted by HOLA, as asserting requirements regarding the processing and origination of mortgages under 12 C.F.R. § 560.2(b)(10), and so the court found that a contract claim was also preempted because it attempted to impose the USPAP as implied affirmative obligations to the contract. *See id.*

[38] Defendants argue that the claim should be preempted because the contracts allowed

As a straightforward breach of contract claim, it is not preempted under HOLA and its implementing regulations. *See, e.g., Baldanzi v. WFC Holdings Corp.*, No. 07-CV-9551 (LTS), 2008 WL 4924987, at *3 (S.D.N.Y. Nov. 14, 2008) (finding breach of contract claim not preempted by HOLA where claim only sought to "enforce the terms of contracts into which Defendant entered"); *see also Mincey v. World Savings Bank, FSB*, 614 F. Supp. 2d 610, 646 (D.S.C. 2008) (holding breach of contract claim not preempted as a "straightforward breach of contract action" as it alleged violation of specific covenant).

Accordingly, the Court concludes that plaintiffs' breach of contract claim is not preempted against Astoria Federal, Astoria Mortgage, and LISB, the remaining defendants in this action.

4. New York General Business Law § 349

Plaintiffs allege a claim under New York General Business Law § 349, which provides that "[d]eceptive acts or practices

---

collection of the Disputed Fees, and so there cannot be breach as a matter of law. The Court disagrees that this is a sound basis for arguing against preemption; the Court is satisfied for the purposes of the preemption issue that the plaintiffs are relying on an argument of breach of a specific explicit obligation in the contract. The issue of whether the claim is not viable as a matter of law based on the terms and conditions of the agreements is addressed in the context of addressing defendants' alternative argument that they are entitled to judgment as a matter of law on the merits of the breach of contract claim. In any event, as discussed *infra*, the Court concludes that defendants' position is incorrect, because disputed issues of material fact exist on the record which preclude granting defendants summary judgment on plaintiffs' breach of contract claims.

in the conduct of any business, trade or commerce or in furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349 (hereinafter, "GBL § 349"). As set forth below, the Court finds that plaintiffs' claim brought under GBL § 349 is not preempted, because it is being asserted as a type of "[c]ontract and commercial law" and its application in this case does not "more than incidentally impact lending operations," pursuant to 12 C.F.R. § 560.2(c)(1).

In *Binetti v. Washington Mutual Bank*, 446 F. Supp. 2d 217 (S.D.N.Y. 2006), a district court determined that a GBL § 349 claim is generally not preempted under HOLA and its implementing regulations. In that case, the court found persuasive an OTS Opinion letter issued in 1996, regarding the Indiana Deceptive Acts and Practices statute ("DAP"), a statute substantively similar to GBL § 349 in its broadly stated prohibition on deceptive acts, which noted that "'[w]hile the DAP may affect lending relationships . . . the impact on lending appears to be only incidental to the primary purpose of the statute – the regulation of the ethical practices of all businesses engaged in commerce in Indiana.'" *Id.* at 219 (quoting Opinion of OTS Chief Counsel, P-96-14, Dec. 24, 1996, *available at* 1996 WL 776462, at *6). The OTS letter further asserted that:

> There is no indication that the law is aimed at any state objective in conflict with the safe and sound regulation of federal savings associations, the best practices of thrift institutions in the United Sates, or any other federal objective identified in § 560.2(a). In fact, because federal thrifts are presumed to act with their borrowers in a truthful manner, Indiana's general

prohibition on deception should have no measurable impact on their lending operations.

*Id.* The Court found that as with the Indiana law, GBL § 349 "is not directly aimed at lenders, and has only an incidental impact on lending relationships" and is "precisely the type of general commercial law designed to 'establish the basic norms that undergird commercial transactions' that OTS has indicated that it does not intend to preempt." *Id.* at 220 (quoting Opinion P-96-14, 1996 WL 767462, at *5).

In reaching the conclusion, however, the district court in *Binetti* was compelled to distinguish a more recent OTS Opinion letter, which analyzed the California Unfair Competition Act ("UCA"), and found that federal law preempted the application of certain provisions of the UCA with respect to "three specific areas of lending operations, including advertising, forced placement of hazard insurance, and the imposition of certain loan-related fees." *Binetti*, 446 F. Supp. 2d at 220 (citing OTS Opinion Letter, P-99-3, Mar. 10, 1999, *available at* 1999 WL 413698). In that 1999 letter, the OTS expressed that its opinion was limited to the "narrow circumstances" presented, which involved a situation in which parties were using the UCA to require "particular lending disclosures" and otherwise "'in an attempt to set substantive standards for [federal thrift associations'] lending operations and practices.'" *Id.* (quoting OTS Opinion Letter P-99-3, 1999 WL 413698, at *7). OTS emphasized "'the extremely limited nature of [the] preemption determination,'" expressly providing that:

> Our finding of preemption is only based on how the UCA has been used by private and governmental plaintiffs to set standards in three specific areas

of a thrift's lending operations discussed herein, areas that have traditionally been governed by federal law. *We do not preempt the entire UCA or its general application to federal savings associations* in a manner that only incidentally affects lending and is consistent with the objective of allowing federal savings associations to operate in accordance with uniform standards.

*Id.* (quoting OTS Opinion Letter P-99-3, 1999 WL 413698, at *10 (emphasis added)). The court found the 1999 letter inapplicable to its analysis of the preemption of § 349 because it found no indication that it was being used "to set substantive standards or establish particular requirements for lending operations in the state of New York." *Id.*

On the other hand, in *Cedeno v. Indymac Bancorp.*, No. 06-CV-6438 (JGK), 2008 WL 3992304 (S.D.N.Y. Aug. 26, 2008), another court in this circuit reached a contrary conclusion, finding a GBL § 349 claim preempted. *See id.* at *8-9. In that case, the court noted that plaintiff's claim arose from allegations that defendant had failed to disclose information about its appraisal practices and the substance of those practices. *See id.* at *9. "As applied" to those specific allegations, the court determined that they were attempting to impose substantive requirements regarding loan-related fees, disclosure of information regarding the fees, and the processing and origination of mortgages, which are areas from which state law is expressly preempted under 12 C.F.R. §§ 560.2(b)(5),(9),(10). *Id.* In reaching its conclusion regarding preemption, *Cedeno* explicitly distinguished *Binetti* on the grounds that the claim in *Binetti* "arose strictly out of the lender's failure to adhere to the terms of its contract

with the plaintiff" rather than "conduct directly regulated by OTS: the processing and origination of mortgages, a loan-related fee, and the accompanying disclosure." *Id.*

*Binetti* and *Cedeno* are easily harmonized. First, *Binetti* stands for the proposition that, as a general matter, claims brought under broad consumer deceptive practices statutes such as GBL § 349 are not preempted because they simply seek to enforce truthfulness in commercial transactions, which is expected of federal thrift institutions as a baseline matter. Implemented in such a fashion, § 349 is not inconsistent with a single uniform scheme of federal regulation over HOLA-regulated entities. However, *Cedeno* (consistent with the 1999 OTS opinion letter regarding the California UCA) stands for a limited exception to this general rule, under which plaintiffs are preempted from bringing GBL § 349 claims which attempt to establish extra-contractual substantive requirements upon federal savings associations which more that incidentally affect lending operations. This exception is sensible because plaintiffs could otherwise achieve an end-around the preemptive effect of HOLA and its implementing regulations through artful pleading, and thereby impose requirements on federal savings associations in a manner which could not be imposed directly through a specific state statute or regulation.

With that framework in mind, the Court finds that plaintiffs' § 349 claim is not preempted, to the extent that plaintiffs seek relief for deceptive acts and practices incident to the alleged breach of the mortgage agreements with defendants. (*See* Defs.' Opp. Mem. at 51 ("Defendants violated GBL § 349 and similar state consumer protection laws by demanding and

collecting the Disputed Fees when they were not owed by Class members.").) *Cedeno* is plainly distinguishable, because plaintiff has asserted that *specific contractual provisions* have been breached when the Disputed Fees were collected from plaintiffs, and thus the GBL § 349 cause of action does not seek to "set substantive standards or establish particular requirements for lending operations in the state of New York." *Binetti*, 446 F. Supp. 2d at 220; *see also Cassese* MTD Opinion at 31-33 (holding GBL § 349 claim and breach of contract claims not preempted; "[GBL § 349] complements, rather than conflicts with, the federal regulatory scheme").

However, the Court notes that in their papers, plaintiffs have asserted that they *also* may recover on their GBL § 349 claim on the basis that defendants improperly collected fees pursuant to NYRPL § 274-a. (*See* Pls.' Supp. Opp. Mem. at 22.) Indeed, the Second Circuit has indicated that "collecting fees in violation of other federal or state laws may satisfy the misleading element of § 349." *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007) (citations omitted). However, the Court finds that, under *Cedeno*, plaintiffs' claim under GBL § 349 is preempted, insofar as it seeks recovery for violation of NYRPL § 274-a or NYRPAPL § 1921, because as applied, it would more than incidentally affect lending operations.

Accordingly, the Court concludes that plaintiffs' GBL § 349 claim is not preempted against Astoria Federal, Astoria Mortgage, and LISB, the remaining defendants in this action, but only to the extent that plaintiffs are seeking recovery for alleged deceptive business practices incident to the alleged breach of contract.

### 5. Unjust Enrichment & Fraud Claims

Plaintiffs allege New York common law claims for unjust enrichment and fraud. Defendants do not assert any specific preemption arguments with respect to these claims and appear to rely upon the general preemption arguments asserted with respect to the other state law claims – namely, they contend that the plaintiffs are attempting to use these claims to impose affirmative obligations that would more than incidentally impact their lending operations. For substantially the same reasons that the Court found the breach of contract and GBL § 349 claims to not be preempted, the Court also finds that the common law claims as alleged in this case are also generally not preempted. These claims are laws of general application, which simply seek redress for allegations that the plaintiffs were not treated honestly and fairly as customers under common law standards applicable to businesses. *See, e.g., In re Ocwen*, 491 F.3d at 643-44 ("OTS's assertion of plenary regulatory authority does not deprive persons harmed by the wrongful acts of savings and loans associations of their basic state common-law-type remedies."). As OTS has instructed, "[f]ederal thrifts are presumed to interact with their borrowers in a truthful manner," and so laws which generally impose obligations of truthfulness "should have no measureable impact on lending operations." Opinion of OTS Chief Counsel, P-96-14, Dec. 24, 1996, *available at* 1996 WL 767462, at *6 (concluding that Indiana Deceptive Act and Practices statute not preempted by HOLA and implementing regulations). Consequently, because plaintiffs' fraud and unjust enrichment causes of action are not state laws which impose specific substantive standards which more than incidentally affect lending operations, these claims are not preempted. *See Badanzi*, 2008 WL 4924987, at *3 (holding common law claim for unjust enrichment not preempted; "[p]laintiffs' claims in the instant case, asserted under generally applicable common law principles and statutes, seek only to . . . test Defendant's conduct of its business by the same standards applied to other business enterprises, and to recover gains allegedly obtained unjustly . . . [t]hey do not seek to impose any limitations on the Defendant's exercise of its national banking power and thus invoke laws that would only affect that power incidentally, if at all"); *see also Cassese* MTD Opinion, at 34-35 (holding that unjust enrichment and common law fraud claims alleged under New York law were not preempted by HOLA and its implementing regulations); *Binetti*, 446 F. Supp. 2d at 218 (noting that the court had previously found unjust enrichment claim not preempted under HOLA and its implementing regulations).[39]

Accordingly, the Court concludes that plaintiffs' fraud and unjust enrichment claims are not preempted against Astoria Federal, Astoria Mortgage, and LISB, the remaining defendants in this action.

---

[39] As the Court discussed *supra* in the context of discussing the breach of contract and GBL § 349 claims, a different result would be required if it was apparent that the plaintiffs were attempting to use these general common law causes of action as a back door to imply specific requirements outside of the contract that would more than incidentally impact lending operations, that the state could not otherwise enact directly through statute or regulation. *Cf. Cedeno*, 2008 WL 3992304, at *9 (finding GBL § 349 claim preempted where the generalized statute, as applied in the case, would more than incidentally affect lending operations because it was seeking to set substantive standards upon the appraisal process).

### 6. Preemption Conclusion

For the reasons set forth above, the Court finds that HOLA and its implementing regulations preempt plaintiffs' claims arising under NYRPL § 274-a and NYRPAPL § 1921 against all remaining defendants. However, plaintiffs' claims for breach of contract, GBL § 349, unjust enrichment and fraud are not preempted. The Court proceeds to examine defendants' motion for summary judgment on the merits of each of these remaining claims in the following section.

### E. State Law Claims

As discussed *supra*, plaintiffs' breach of contract, violation of GBL § 349, unjust enrichment, and fraud claims survive federal preemption. Because plaintiffs have moved for summary judgment on the breach of contract, unjust enrichment and GBL § 349 claims, and defendants have alternatively moved for summary judgment on all the remaining claims on the merits, the Court proceeds to those portions of the parties' motions. For the reasons set forth below, the Court denies the cross-motions for summary judgment on the breach of contract and GBL § 349 claims, because material disputed issues of fact remain. On the other hand, defendants' motion for summary judgment on the unjust enrichment and fraud claims are granted, because the Court finds that the claims are merely duplicative of plaintiffs' contract claims.

### 1. Breach of Contract

The parties cross move for summary judgment on the breach of contract claim. In order to prove such a claim under New York law, a plaintiff must demonstrate: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994) (citation omitted); *accord Singapore Recycle Centre Pte Ltd. v. Kad Int'l Marketing, Inc.*, No. 06-CV-4997 (RRM), 2009 WL 2424333, at *4 (E.D.N.Y. Aug. 6, 2009). For the reasons set forth below, both parties' motions are denied because of the existence of disputed issues of material fact regarding the breach of contract claim.

Defendants concede that they collected some of the Disputed Fees with respect to some of the named plaintiffs in contravention of their mortgage agreements. Specifically, they acknowledge that they improperly collected the Atty Doc Prep Fee under the controlling language of both the McAnaneys' First Loan and the Russo Loan, which dictates that the borrower will "[n]ot be required to pay Lender for the discharge, but [borrower] will pay all costs of recording the discharge in the proper official records." (*See* Defs.' Supp. Mem. at 22 ("The McAnaney Investor Loan did not permit Astoria Federal Savings to charge the Atty Doc Prep Fee because the loan was sold to FNMA and the Russo Loan also did not permit the fee."); *see also* Decl. of William Conboy, Dec. 15, 2006, Ex. E (hereinafter, "McAnaney Investor Loan Agreement") at § 22; Ex. L (hereinafter, "Russo Loan Agreement") at § 23).) Notwithstanding this admitted breach, defendants claim that they are nevertheless entitled to summary judgment on the basis that plaintiffs cannot prove any damages, based on their assertion that they refunded the Atty Doc Prep Fee on the loans to the borrowers' escrow accounts on the same day that the fee was collected. (*See* Defs.' Mem. at 33; Defs.' Supp. Mem. at 22-23.) Defendants further contend that, although they concede that at least the Atty Doc Prep Fee was improperly collected on a regular

basis due to computer error, they had sufficient controls in place to ensure that this mistake was detected and proper refunds provided on a consistent basis. (*See* Aff. of William Conboy, Dec. 15, 2006, ¶ 44 (noting that payoff verification representative reviewed and applied the same confirmation and reconciliation procedures to all loan payoffs . . [a]ny similar errors affecting other customers should also have been identified and corrected the same day that a loan payoff came in"); Aff. of William Conboy, Mar. 5, 2007, ¶¶ 22 ("[P]ayoff representatives always recalculated the amounts due, including all fees, as of the date the loan payoff was received."), 23 ("Because the calculations done at payoff were not affected by the coding error . . the $125 Atty Doc Prep Fee should not have been collected from any customer whose loan agreement did not permit the fee.") & Ex. 2 (Payoff Department Procedure Manual, instructing payoff representatives to "[e]nsure that fees are not improperly charged on an investor account").)

The Court finds, however, that there are disputed issues of material fact regarding whether the Atty Doc Prep Fee was in fact refunded to the McAnaneys and Russos, as well as to other class members, as asserted by defendants. In support of this contention, defendants cite to the affidavit of William C. Conboy, who asserts that these refunds were made, as *components* of a $151.01 credit made by defendants to the McAnaneys' escrow account on December 4, 2002, and a similar $594.67 credit to the Russos' escrow account on June 15, 2004. (*See* Aff. of William Conboy, Dec. 15, 2006, at ¶¶ 57, 70.) However, although defendants submit documentary evidence that those credits were made, none of this evidence indicates that this credit in part included any refund

for improper collection of the Atty Doc Prep Fee. (*See id.* at Exs. H-J, P.) Viewing this evidence in a light most favorable to plaintiffs, as the non-moving party, there is absolutely no indication in these documents that these refunds incorporated the Atty Doc Prep Fee, particularly where, as here, there is no other documentary evidence that the Atty Doc Prep Fee was included, and it is undisputed that the McAnaneys and Russos were never informed of the improper collection or alleged refund of the Atty Doc Prep Fee. (*See* Pls.' 56.1 ¶¶ 34-35, 82-83.)[40] In addition, although defendants admit that the improper collection of at least the Atty Doc Prep Fee was due to a computer error, and claim that they had proper controls in place which would detect these errors such that proper refunds could be regularly provided, plaintiffs have pointed to competent record evidence to put the quality and effectiveness of those purported controls in dispute. Specifically, plaintiffs point to deposition testimony that indicates that the computer error that caused the improper inclusion of the Atty Doc Prep Fee may have existed for almost three years, that after the computer error was detected, no retroactive review was performed to determine whether other accounts were

---

[40] Defendants denied the paragraphs in plaintiffs' Local Rule 56.1 statement regarding the factual allegation that they never informed the McAnaneys and Russos that they improperly collected the Atty Doc Prep Fee or had provided them with refunds. Defendants did not, however, cite to any admissible evidence disputing this factual allegation, and plaintiffs provided a proper citation to defendants' responses to their Requests for Admission, in which defendants plainly conceded that they had not provided notice of the improper collection or alleged refund to at least the McAnaneys. (*See* Decl. of Joseph Tusa, Dec. 20, 2006, Ex. 2 at No. 40.)

improperly charged with the Atty Doc Prep Fee, and documentary evidence instructing review of accounts for improper charge of the Atty Doc Prep Fee only upon customer or legal complaint. (*See* Tusa Decl., Dec. 20, 2006, Ex. 14 (Dep. of William Conboy) at 195-96 (noting that computer error resulted from upgrade to system in September 2001 and not detected until August 2004); Ex. 17 (Dep. of Cari Rederman) at 176 (deposition testimony of manager of payoff department that "[w]e didn't go and do a review of all accounts); Ex. 39 (e-mail dated October 10, 2000 from Andrew Frank to payoff department, noting that Atty Doc Prep Fees are occasionally charged improperly in contravention of loan agreements, therefore directing employees to "[p]lease review the documents carefully on any customer/legal complaint issued.").) Accordingly, on this record, the Court cannot find that defendants have met their burden to demonstrate their entitlement to summary judgment on the basis that plaintiffs cannot prove damages by virtue of defendants' assertion that the Atty Doc Prep Fee was refunded to the McAnaneys, the Russos, or members of the class generally.

Alternatively, the Court finds that there are disputed issues of material fact with respect to whether or not there was a breach with respect to defendants' collection of the Facsimile Fee. The Court notes that defendants do not contend that they refunded that fee — defendants, rather, have contended that they were properly collected in all instances. Specifically, defendants assert that the Facsimile Fee was not collected in breach of contract because: (1) the Facsimile Fee was not contemplated by the mortgage contract, and did not need to be included in the contract because a lender "cannot anticipate every service request made by a borrower"; and (2) in any event,

plaintiffs were informed that they would incur the Facsimile Fee when requesting a payoff statement, and voluntarily assumed the charge. (*See* Defs.' Supp. Mem. at 23.) For the reasons stated below, the Court finds that there are disputed issues of material fact with respect to both of defendants' arguments.

First, the Court finds sufficient ambiguity in the terms of the various mortgage agreements such that whether the mortgage agreements contemplated and contained a prohibition on collection of the Facsimile Fee is a question of fact that should be resolved by the jury. In its most basic form, the McAnaneys' Second Loan and the Russo Loan included a broad prohibition on the collection of any fees in connection with loan discharge, other than charges explicitly carved out for recording the discharge in official records:

> I will not be required to pay Lender for the discharge, but I will pay all costs of recording the discharge in the proper official records.

(McAnaney Investor Loan Agreement at § 22; Russo Loan Agreement at § 22). Viewing this provision in a light most favorable to plaintiffs as the non-moving party, this restriction could be read to cover the Facsimile Fee, given that it is related to loan discharge insofar as it was incurred in connection with a payoff statement provided to plaintiffs for prepayment of their loan obligations, and is not related to official recordation. In a similar fashion, another standardized form of the loan agreements, including that found in the Horn Loan and the Reilly Loan, included language that contemplated other fees for discharge may be charged, but *only if* paid to a third party for services rendered:

I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

(Decl. of Alfred W.J. Marks, Apr. 18, 2008, Ex. C (hereinafter, "Horn Loan Agreement") at § 23; Decl. of William Conboy, Dec. 15, 2006, Ex. Y (hereinafter, "Reilly Loan Agreement"), at § 23.) This provision could also be reasonably interpreted to cover the Facsimile Fee — although it does allow for other fees to be paid in connection with discharge, it only contemplates payments to third parties, and the Facsimile Fee collected by defendants would not qualify as a payment to a third party for services rendered. Consequently, because of this ambiguity as to whether the various prohibitions on the collection of fees related to loan discharge cover the Facsimile Fee, summary judgment must be denied. *See Hoyt v. Andreucci*, 433 F.3d 320, 331 (2d Cir. 2006) ("Where, as here, the meaning of a particular contractual provision is ambiguous and the intent of the parties cannot be determined from the contractual language itself, the ambiguity presents a question of fact to be resolved by a jury.") (citing *Mallad Constr. Corp. v. County Fed. Sav. & Loan Ass'n*, 32 N.Y.2d 285, 291 (N.Y. 1973)); *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) ("[W]hen the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment.")

(citation and internal quotation marks omitted).

Likewise, the Court finds that there remains disputed issues of material fact regarding whether defendants' customers were adequately informed of the $25 Facsimile Fee for a payoff statement, and the option to receive the statement by regular mail at no charge. In support of their contention that plaintiffs were adequately apprised of and voluntarily accepted those fees, defendants offer affidavit testimony that customer service representatives were instructed to inform customers of the option to receive the payoff statements by mail for no charge, and that the Autofax system automatically informed customers of this option. (*See* Decl. of William Conboy, Dec. 15, 2006, ¶¶ 24-26; Decl. of William Conboy, Mar. 16, 2007, ¶¶ 4-9.) In addition, defendants provide a script for the Autofax system dated 2000, which includes a prompt that advises customers of the $25 fee for faxing a payoff statement, and asks if they accept the fee and wish to continue. (*See* Decl. of William Conboy, Mar. 16, 2007, Ex. A.) As an initial matter, the Court notes that the Autofax script that defendants cite to does not inform individuals that they may receive the payoff statement for no fee by opting for the payoff statement to be sent by regular mail; rather, the script informs the caller that "[a] 25 dollar fee will be added to your payoff figure for this service," and then provides the following options: (1) "accept the fee and continue"; (2) "cancel the request and return to the main menu"; and (3) "speak with a Customer Service Representative." *Id.* In addition, plaintiffs have put in issue whether customer service representatives consistently inform customers of their ability to avoid the fee through the deposition testimony of Philip Russo, who stated that he was not informed

about the applicability of the fee at all when he requested the payoff statement from a representative. (*See* Decl. of Joseph S. Tusa, Mar. 2, 2007, Ex. O at 73 ("Q. And were you advised by the individual you spoke with at Astoria Federal that you would incur a $25 fee for having the payoff letter faxed to your attorney? A. No.").) Summary judgment is thus not warranted on this ground.

Finally, defendants are also not entitled to summary judgment because plaintiffs have cited competent evidence on the record from which a reasonable jury could conclude that the Recording Fee was collection in breach of the contract. Specifically, all of the loan agreements contained a similar provision that the borrower "will pay all costs of recording the discharge in the proper official records." (*See, e.g.*, McAnaney Investor Loan Agreement at § 22; *accord* Russo Loan Agreement at § 22; Reilly Loan at § 23.) Plaintiffs have pointed to evidence on the record which appears to indicate that: (1) the McAnaneys, Russos, and Reillys all informed defendants that they would have their title insurer file their loan satisfaction documents with the appropriate state officials on their behalf (*See* Decl. of Joseph S. Tusa, Mar. 2, 2007, Exs. P-T); (2) that defendants complied with this request by sending the satisfaction documents to the requested entity (Decl. of Joseph S. Tusa, Dec. 20, 2006, Ex. 2 at Nos. 20, 48, 79, 107, 135); yet (3) it is undisputed defendants still charged these named plaintiffs the Recording Fee, and defendants do not assert that they provided any form of refund or credit to plaintiffs' escrow accounts for this charge. On this record, a reasonable jury could find that defendants' breached the various loan agreements by charging for a Recording Fee which did not in fact reflect "the cost of recording the discharge in the proper official records," which forms yet another independent basis for denying summary judgment on the breach of contract claim.

For substantially the same reasons, the Court finds that plaintiffs' cross-motion for summary judgment on their breach of contract claim must also be denied. With respect to collection of the Atty Doc Prep Fee, there are serious questions regarding whether they have sustained any damages — viewing the evidence in a light most favorable to the defendants as the non-moving party on plaintiffs' summary judgment motion, a reasonably jury could determine that there were no damages; that prompt refunds were credited to the escrow accounts for loan agreements which did not permit collection of the fee, and that defendants adequately addressed the computer error as to the class generally, by having employees verify payoff statements for accuracy. Similarly, with respect to the Facsimile Fee, a reasonable finder of fact could determine that collection of the Facsimile Fee was not contemplated by and covered by contractual restrictions regarding fees related to loan discharge, and that the plaintiffs in fact voluntarily assumed the fees after being informed of the cost and the opportunity to opt out and receive the payoff statement through other means.

Accordingly, the Court denies the parties' cross-motions for summary judgment on plaintiffs' claim for breach of contract.

## 2. GBL § 349

The parties cross-move for summary judgment on the claim brought pursuant to GBL § 349. In order to prove such a claim under New York law, a plaintiff must demonstrate that: "(1) the defendant's

challenged acts or practices must have been directed at consumers, (2) the acts or practices must have been misleading in a material way, and (3) the plaintiff must have suffered injury as a result." *Cohen v. JP Morgan & Chase Co.*, 498 F.3d 111, 126 (2d Cir. 2007) (citations omitted). For the reasons stated below, the Court finds that both parties' motions must be denied because disputed material issues of fact remain regarding the alleged breach of contract, as discussed *supra*.

First, the Court finds that plaintiffs' motion for summary judgment on the GBL § 349 claim is unwarranted. The plaintiffs appear to be proceeding on two theories for recovery under GBL § 349: (1) that the defendants improperly collected the Disputed Fees in violation of the loan agreements with plaintiffs; and (2) defendants collected fees in violation of state law. (*See* Pls.' Opp. Mem. at 51-56; Pls.' Supp. Reply Mem. at 22.) However, the Court has found that only the claim incident to breach of contract would not be preempted. Summary judgment is accordingly denied to plaintiffs on their GBL § 349 claim on the same grounds that summary judgment was denied to them on their breach of contract claim, as discussed *supra*.

Defendants' motion for summary judgment is likewise defective. First, defendants move for summary judgment on the GBL § 349 claim based on arguments that they were allowed to collect the Disputed Fees under the agreements, and that the Facsimile Fee was disclosed to plaintiffs and voluntarily incurred. As discussed previously in the context of the breach of contract claim, disputed issues of material fact remain as to both of these defenses, and thus summary judgment is unwarranted on that basis. Additionally, defendants assert that they are entitled to a "complete defense" from liability under GBL § 349(d) as a matter of law, because they claim that their disclosures and collection of the Disputed Fees complied with federal law. *See* GBL § 349(d) ("In any action it shall be a complete defense that the act or practice is, or if in interstate commerce would be, subject to and complies with the rules and regulations of, and the statutes administered by, the federal trade commission or any federal department, division, commission or agency of the United States as such rules, regulations or statutes are interpreted . . ."). Defendants' entire argument is premised upon an assertion that they complied with TILA's disclosure requirements as a matter of law. As a threshold matter, this argument is defective on its face because the Court has found that there exist disputed issues of material fact regarding plaintiffs' TILA claims. In any event, defendants have not offered any explanation as to why TILA or any other federal law would sanction breach of contract, if found by a jury, and thereby immunize a finding that defendants violated § 349 incident to that breach.[41]

---

[41] The Court finds inapplicable the line of cases that have dismissed GBL § 349 claims where they find the claims to be merely duplicative of a breach of contract claim between private parties, and fail to demonstrate that a particular act was misleading to the consumers at large. *See Washington v. Kellwood Co.*, No. 05-CV-10034 (DAB), 2009 WL 855652, at *8 (S.D.N.Y. Mar. 24, 2009) ("Plaintiffs fail to identify how any particular act alleged . . . was misleading to the public or consumers at large. Instead, Plaintiff's allegations center on a contractual dispute between private parties, and thus cannot meet the requirements of [GBL § 349]."); *Continental Cas. Co. v. Nationwide Indem. Co.*, 16 A.D.3d 353, 354 (N.Y. App. Div. 2005)

Accordingly, the Court denies the parties' cross-motions for summary judgment on the GBL § 349 claim.

### 3. Unjust Enrichment

The parties cross-move for summary judgment on plaintiffs' common law cause of action for unjust enrichment. In order to prove such a claim under New York law, a plaintiff must demonstrate: "(1) that the defendant benefitted; (2) at the plaintiffs' expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (citations and internal quotation marks omitted). "It is important to note, however, the nature of an unjust enrichment claim in New York: 'The theory of unjust enrichment lies as a quasi-contractual claim. It is an obligation the law creates *in the absence of any agreement.*'" *Id.* at 586-87 (quoting *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572 (N.Y. 2005)) (emphasis in original). The Court finds that plaintiffs cannot proceed with their unjust enrichment claim because defendants' collection of the Disputed Fees was plainly incident to written agreements between the parties. *See Beth Israel*, 448 F.3d at 587-88 ("[A]ll claims for unjust enrichment are dismissed as precluded under New York law and inconsistent with the [plaintiffs'] own pleadings because we have found valid, enforceable contracts between [defendant] and the [plaintiffs]."); *see also CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, No. 07-CV-11078 (LTS), 2009 WL 2033048, at *8 (S.D.N.Y. July 13, 2009) (dismissing unjust enrichment claim based upon existence of written contract between the parties); *accord Atlantis Info. Tech, GmbH v. CA, Inc.*, 485 F. Supp. 2d 224, 234 (E.D.N.Y. 2007). Plaintiffs have successfully stated a breach of contract claim, pursuant to which they can potentially obtain restitution on the Disputed Fees if they are successful in proving that claim at trial.[42]

---

("[A]lleg[ations] that plaintiffs insurers repeatedly misrepresented the meaning of their standard comprehensive general liability policies both to businesses they sold the policies to . . . and to defendants themselves . . . at best show a private contract dispute . . . not conduct affecting the consuming public at large, and thus do not state a cause of action under section 349."). Plaintiffs are permitted to proceed on a their § 349 claim incident to the breach of contract alleged in this case, because there is evidence that defendants have targeted consumers generally through standard form contracts, which were also administered in a standardized manner. *See Kurschner v. Mass. Cas. Ins. Co.*, No. 08-CV-1011 (JFB), 2009 WL 537504, at *5 (E.D.N.Y. Mar. 3, 2009) ("Where, as here, a defendant allegedly enters into 'contractual relationship[s] with customers nationwide,' via a standard form contract and has allegedly committed the challenged actions in its dealings with multiple insureds, such behavior plausibly affects the public generally and, therefore, plaintiff has sufficiently pled the requirement of 'consumer-oriented' conduct within the meaning of Section 349. . .") (collecting cases); *cf. Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 51-51 (2d Cir. 1992) (holding GBL § 349 applicable to insurers where plaintiff demonstrated that similar practices had been employed by defendant against multiple insureds in the general public).

---

[42] The Court notes that plaintiffs never submitted a response to defendants' argument that the unjust enrichment claim should be dismissed as duplicative of the breach of contract claim, notwithstanding the fact that defendants have consistently raised the argument in their papers. (*See* Defs.' Mem. at 34; Defs.' Supp. Mem. at 24.)

Accordingly, the Court grants summary judgment to defendants with respect to plaintiffs' common law claim for unjust enrichment under New York law.

### 4. Fraud

Defendants move for summary judgment on plaintiffs' common law cause of action for fraud. In order to prove such a claim under New York law, a plaintiff must demonstrate: (1) a false representation of material fact; (2) knowledge by the party who made the representation that it was false when made; (3) justifiable reliance by the plaintiff; and (4) damages. *See Evans v. Ottimo*, 469 F.3d 278, 283 (2d Cir. 2006); *accord Selinger Enters., Inc. v. Cassuto*, 50 A.D.3d 766, 768 (N.Y. App. Div. 2008).

Defendants claim that plaintiffs' fraud claim is deficient for a number of alternative reasons, including: (1) the third amended complaint does not allege the misrepresentations that form the basis of the fraud claim with sufficient particularity, as required by Rule 9(b) of the Federal Rules of Civil Procedure; (2) the fraud claim should be dismissed as duplicative of the breach of contract claim; (3) plaintiffs cannot demonstrate that defendants made any intentionally false statements of fact; (4) plaintiffs cannot show detrimental reliance or materiality; and (5) plaintiffs cannot demonstrate sufficient damages. (*See* Defs.' Mem. at 35-37; Defs.' Supp. Mem. at 24.) Although defendants have repeatedly asserted these specific defenses, however, plaintiffs have only offered a general argument in response that their "memoranda, declarations and evidentiary submissions in support of their Summary Judgment motion and in opposition to Defendants' motion roundly demonstrate that Plaintiffs have proven their claims," including fraud. (*See* Pls.' Opp. Mem at

56.) That assertion solely references a 23-page portion of their memorandum in support of their motion for summary judgment (Pls.' Mem. at 22-45), a section which contains no discussion regarding whether the record evidence supports a claim for common law fraud under New York Law, and only asserts arguments that: (1) defendants breached their contracts with members of the class by collecting the Disputed Fees (*see* Pls.' Mem. at 22-23); (2) the Disputed Fees were wrongfully collected in contravention of their loan agreements for years without notifying plaintiffs, Fannie Mae, Freddie Mac or regulatory authorities (*see* Pls.' Mem. at 23-27); (3) the plaintiffs are entitled to attorneys' fees because defendants stopped collecting the Disputed Fees in contravention of the agreements as a result of the actions of class counsel (*see* Pls.' Mem. 27-32); and (4) all class members from which Disputed Fees were collected as prohibited by their loan agreements are entitled to summary judgment on their breach of contract and unjust enrichment claims (*see* Pls.' Mem. at 41); and (4) the Facsimile Fee was prohibited under New York statutes NYRPL § 274-a and GBL § 349 (*see* Pls.' Mem. at 42-45).

All of the foregoing arguments incorporated by reference either relate to defendants' collection of Disputed Fees in alleged breach of the contract, save for the claim that the Facsimile Fee was collected in violation of New York law, a claim that is preempted, as discussed *supra*. Consequently, it is plain to the Court that plaintiffs' fraud claim is merely duplicative of the breach of contract claim. *See Guilber v. Gardner*, 480 F.3d 140, 148 (2d Cir. 2007) (affirming dismissal of fraud claim as duplicative of breach of contract claim); *see also Linea Nuova, S.A. v. Slowchowsky*, 62

A.D.3d 473 (N.Y. App. Div. 2009) (same); *Krantz v. Chateau Stores of Canada*, 256 AD.2d 186, 187 (N.Y. App. Div. 1998) ("A cause of action for fraud does not arise when the only fraud charged relates to a breach of contract.").[43]

Accordingly, the Court grants summary judgment to defendants with respect to plaintiffs' common law claim for fraud under New York law.

---

[43] Because the Court has determined that dismissal is warranted on this basis, it does not reach defendants' alternative arguments for summary judgment on the fraud claim on the merits, arguments that plaintiffs have completely failed to provide a response to. The Court also declines plaintiffs' invitation to otherwise scour the entire record, including "all memoranda, declarations and evidentiary submissions" to manufacture an argument that plaintiffs have developed sufficient evidence from which a reasonable finder of fact could determine that defendants are liable for fraud, independent of any breach of contract. *Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002) ("Appellant's brief is tantamount to an invitation for us to scour the record, research any legal theory that comes to mind, and serve generally as an advocate for appellant . . . we will not do so here.") (internal citation, quotation marks and alterations omitted); *see also Albrechtsen v. Bd. of Regents of Univ. of Wis. System.*, 309 F.3d 433, 436 (7th Cir. 2002) ("Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment state to paw through the assembled discovery material.") (Easterbrook, J.); *Scott v. City of N.Y. Dep't of Corr.*, -- F. Supp. 2d --, No. 04-CV-9638 (SHS), 2009 WL 1683350, at *2 (S.D.N.Y. June 17, 2009) (noting that Court is not "required to scour the record looking for factual disputes").

## F. Attorneys' Fees

Plaintiffs seek summary judgment on their claim for attorneys' fees, claiming that by filing and prosecuting the action they have conferred benefits to class members, because, *inter alia*, defendants have made some refunds as a result of this action and have changed some of their processes, which plaintiffs claim will prevent other borrowers from being injured. Because the Court has determined that defendants' motion for summary judgment must be denied in part, and a trial on the merits is therefore necessary, it exercises its discretion to defer ruling on plaintiffs' motion for attorneys' fees until after the conclusion of the trial. *See, e.g., Bank of China, N.Y. Branch v. NBM L.L.C.*, No. 01-CV-0815 (DLC), 2004 WL 1907308, at *5 (S.D.N.Y. Aug. 26, 2004), *aff'd*, 243 Fed. Appx. 657 (2d Cir. 2007) (deferring motion for attorneys' fees and costs until after trial of claims which survived summary judgment); *see also Lambertson v. Six West Retail Acquisition, Inc.*, No. 98-CV-8053 (DLC), 2002 WL 59424, at *8 (S.D.N.Y. Jan. 16, 2002) (deferring determination of motion for attorneys' fees and costs "because of the potential of a new trial on punitive damages"; indicating that motion would be denied without prejudice to renewal following completion of new trial); *Baskin-Robbins, Inc. v. S & N Prinja, Inc.*, 78 F. Supp. 2d 226, 234 (S.D.N.Y. 1999) (granting in part plaintiff's motion for summary judgment, but deferring attorneys' fees application until after trial). Accordingly, the Court denies plaintiffs' motion for attorneys' fees, without prejudice for renewal following resolution of the surviving claims at trial.

## IV. Conclusion

For the foregoing reasons, it is hereby ordered that defendants' motion for summary judgment as to defendants Astoria Financial and LIB are granted, and, accordingly, the Clerk of the Court shall terminate Astoria Financial and LIB as defendants from this case. Further, defendants' motion for summary judgment is granted with respect to named plaintiff Horn's HOEPA claim, as well as plaintiffs' claims alleging violation of New York Real Property Law § 274-a, New York Real Property and Proceedings Law § 1921, and common law claims for unjust enrichment and fraud. However, defendants' motion for summary judgment is denied with respect to plaintiffs' TILA, New York General Business Law § 349, and breach of contract claims. Plaintiffs' cross-motion for summary judgment is denied in its entirety. Finally, plaintiffs' motion for attorneys' fees and costs is deferred until after trial, and is therefore denied without prejudice for renewal at a later juncture.

It is further ordered that the parties participate in telephonic pre-trial conference on Wednesday, October 7, 2009 at 4:00 p.m. Counsel for plaintiffs is directed to initiate the call by first getting counsel for defendants on the line, and then contacting Chambers at the scheduled time.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 29, 2009
Central Islip, NY

* * *

Plaintiffs are represented by Joseph S. Tusa, Esq., and Paul C. Whalen, Esq., of Whalen & Tusa, 90 Park Avenue, New York, New York 10016, and G. Oliver Koppell, Esq., of G. Oliver Koppell & Associates, 99 Park Avenue, New York, New York 10016. Defendants are represented by Alfred W.J. Marks, Esq., Rosemary Q. Barry, Esq., and Lisa Pepe Whittaker, Esq., of Day Pitney LLP, 7 Times Square, Times Square Tower, New York, New York 10036.